GEORGE V. ZMUDA AND WALBURGA ZMUDA, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8572–80. Filed November 8, 1982.

*Michael R. Pinatelli*, for the petitioners.
*Jeannette A. Cyphers*, for the respondent.

DRENNEN, *Judge*: Respondent determined deficiencies in and additions to petitioner's Federal income taxes as follows:

| Year | Deficiency | Additions to tax sec. 6653(a)[1] |
|------|-----------|----------------------------------|
| 1976 | $1,358 | 0 |
| 1977 | 1,341 | $67 |
| 1978 | 2,106 | 105 |

After concessions,[2] the issues are (1) whether petitioners are taxable in 1977 and 1978 on income received by a purported "common law business trust"; (2) whether petitioners are entitled to a deduction for amounts paid in 1977 to purchase a package of materials informing them on how to set up the "common law business trusts"; (3) whether petitioners are entitled to a charitable deduction in 1977 in excess of the amount allowed by respondent; (4) whether petitioners are entitled to a casualty loss deduction in 1976 and 1977; (5) whether petitioners are entitled to a business expense deduction in 1977; and (6) whether petitioners are liable for additions to tax imposed in 1977 and 1978 for negligence.

## GENERAL FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by reference.

Petitioners George V. Zmuda (hereinafter petitioner) and

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years in issue.

[2] Respondent concedes that all of the medical expenses claimed on petitioners' 1976 return have been properly substantiated and are allowable deductions. Respondent also concedes that the $840 claimed on petitioners' 1976 return for contributions is deductible and that $392.62 of the $503 claimed as charitable contributions on petitioners' 1977 return is deductible. Petitioners concede on brief that they are not entitled to the employee business expenses claimed in 1976.

Walburga Zmuda, husband and wife, resided in Olympia, Wash., at the time they filed their petition herein.

## FINDINGS OF FACT

### Issue 1. Common Law Business Trust

In September 1977, petitioner flew to the Turks and Caicos Islands, British West Indies, to set up three common law business trusts[3] (sometimes hereinafter referred to as the trusts).[4] Upon arriving there, petitioner contacted a notary, Irene Roberts (hereinafter Irene), and told her he wished to see her and that she should bring along another person to serve as the "creator" of common law business trusts. Irene brought along her brother, Lloyd Roberts (hereinafter Lloyd), to serve as the "creator." Upon meeting Irene and Lloyd,[5] petitioner presented them with some preprinted forms that had been prepared for him, entitled, "Contract and Declaration of Trust." Petitioner, Irene, and Lloyd signed the forms and purportedly created three common law business trusts.

Each trust had 100 beneficial units that were exchanged with petitioner, or one of the other common law business trusts created by petitioner, for certain property. Ownership of the certificates did not entitle the holder to any legal or equitable title in or to the trust property, nor in the management of the trusts. The rights of the certificate holders were limited to merely a claim against the trustees to carry out the terms of the contract and declaration of trust.[6]

Except for the designated trustees and the owners of the beneficial units of the trusts, the contract and declaration of trust for the three organizations contained identical terms and

---

[3] A business trust is an unincorporated business organization created by an instrument by which property is held and managed by trustees for the benefit and profit of such persons as may be or become the holders of transferable certificates evidencing the beneficial interests in the trust estate. 156 A.L.R. 27 (1945). It is intended for the purpose of carrying on some kind of business or commercial activity for profit. The profit-making function is one of the most significant characteristics of the business trust. 156 A.L.R. 30 (1945).

[4] Although we sometimes hereinafter refer to the common law business trusts as "trusts," we do not mean to imply that the purported entities would be recognized as trusts for Federal income tax purposes.

[5] Prior to arriving in the Turks and Caicos Islands, petitioner had never met either Irene or Lloyd Roberts.

[6] In the event the trustees decided to liquidate the trusts, any remaining trust property would be distributed proportionately and in a pro rata manner to the certificate holders.

provisions. The term of each trust was stated to be 25 years, but the trustees were explicitly empowered to extend or shorten the term. Lloyd was the "creator" of each of the three trusts.[7] The creator was to appoint a first trustee who could then appoint a second trustee, and together the two trustees could appoint a third trustee. The property of each of the trusts was assigned to the trustees to hold as joint tenants in fee simple. The trustees were authorized in their sole discretion to make a distribution of the proceeds and income to anyone, including themselves. The declaration of trust also provided that "resolutions of the board of trustees authorizing a special thing to be done shall be evidence that such act is within its power." The effect of these provisions was that the trustees had complete control and dominion of the property of the trusts and were free to distribute or transfer it to whomever they desired.

The first of the three business trusts purportedly created was the Sunnyside Trust Co. (hereinafter Sunnyside). The contract and declaration of trust for Sunnyside provided that the creator (Lloyd) transferred 100 trust units to petitioner[8] in exchange for $100.[9] The creator was to hold the $100 in Sunnyside's name pursuant to the terms of the declaration of trust. The creator then appointed petitioner to serve as the first trustee, and petitioner then appointed his wife to serve as the second trustee.[10] The property of Sunnyside ($100) was assigned to the trustees to hold as joint tenants in fee simple.

The second common law business trust purportedly created was the Medford Trust Organization (hereinafter Medford). The 100 beneficial interest certificates of Medford were transferred to Sunnyside for $50, and Sunnyside was appointed the trustee of Medford. On October 1, 1977, petitioners were

---

[7]Lloyd Roberts was the creator of the business trusts in name only. He did not transfer any property to the business trusts, he did not decide what the terms and provisions of the trusts would be, nor did he do anything else but sign as the creator of the trusts.

[8]On Feb. 3, 1978, petitioner gave the 100 trust certificates to Lloyd.

[9]Of this $100, $50 was shortly thereafter transferred to another trust created by petitioner, and the remaining $50 was kept in a safe in petitioners' residence. No other money or property was added to Sunnyside in 1977 or 1978.

[10]The contract and declaration of trust provided that three children of petitioners would become successor trustees at the death of both petitioners. These successor trustees were instructed to use their control to insure equal distribution of any property under their control to the eight children of petitioners.

appointed the agents of Medford with full authority to open bank accounts in Medford's name and otherwise act for Medford.

The third business trust purportedly created was the Buena Trust Organization (Buena). Sunnyside was named as the trustee of Buena. Petitioner and his wife were appointed as the agents of Buena. Petitioner and his wife transferred the following property to Buena: (1) Four deeds of trust and one real estate contract covering Alaska property; (2) one deed of trust covering Missouri property; (3) one deed of trust covering Oregon property; (4) and one unimproved lot in Alaska. In exchange, petitioner and his wife each received 50 beneficial units of Buena.[11]

The payments due and paid on the deeds of trust and real estate contracts were deposited in various bank accounts of Buena located in the United States. During 1977 and 1978, the payments made to Buena totaled $8,559.84 and $16,487.96, respectively. In 1978, over $24,000 was withdrawn from the Buena accounts and deposited into accounts of Medford.[12] During 1978, $3,220 of this money was distributed by Medford to petitioner and members of his family. In 1978, $18,000 was transferred out of Medford's accounts back into Buena's accounts, $17,600 of which was then paid out to petitioners.[13] It was petitioner's understanding that Buena would continue in existence until all the payments had been received on the real estate trust deeds and contracts and then paid out to petitioner and his family.

Buena did not engage in the operation of any trade or business but rather merely collected the payments on the real estate trust deeds and contracts.

In the notice of deficiency, respondent determined that petitioners failed to include $3,089 of interest income and $313 of capital gains on their 1977 return and that they failed to include $10,165 of interest income and $1,953 of capital gains

---

[11]On Sept. 30, 1977, both petitioners sold their 50 trust certificate units of Buena to Medford for $25 each.

[12]This was the only money Medford received during 1978.

[13]In 1978 Buena purchased for $19,320, payable on an installment note, petitioner-spouse's one-fifth interest in a Wisconsin farm. Part of the $17,600 paid to petitioner appears to be payment on the installment note, but the record does not indicate how much.

income on their 1978 return. These amounts were attributable to payments received by Buena under the real estate trust deeds and contracts.

## OPINION

### Issue 1

The first issue is whether petitioners are taxable on the income received by Buena in 1977 and 1978.

Respondent contends that the creation of Buena was a sham since the transactions have no substance or utility apart from tax considerations and thus petitioners remained the owners of the income-producing property and are taxable on the income therefrom. Alternatively, respondent contends that if Buena is recognized as a valid entity, then it is a trust for which petitioners are treated as the owners under the grantor trust rules.[14] Petitioners assert that Buena should be recognized as a valid entity for Federal income tax purposes and that it should be taxed as a nonresident alien under section 871. Petitioners further assert that Buena is not subject to the grantor trust rules since it is not considered a trust for Federal income tax purposes. We agree with respondent that petitioners did not create an entity recognized for Federal income tax purposes and that since petitioners remained the owners of the income-producing property, the income therefrom is taxable to them.[15]

It is well established that a taxpayer has the legal right to minimize his taxes or avoid them totally by any means which the law permits. *Gregory v. Helvering*, 293 U.S. 465, 469 (1935). However, this right does not bestow upon the taxpayer the right to structure a paper entity to avoid tax when that entity does not stand on the solid foundation of economic reality.

---

[14]Specifically, respondent contends that if the entity is a domestic trust, secs. 671–678 of the grantor trust rules apply, causing the income of the entity to be taxed to petitioners. If the entity is a foreign trust, respondent asserts that sec. 679 of the grantor trust rules apply with the same result.

[15]Due to our holding herein, it is unnecessary to deal with respondent's alternative contention.

However, we note that even if we were willing to recognize Buena as a domestic or foreign trust for Federal income tax purposes, the income it earned may well be taxable to petitioners under the grantor trust rules. See secs. 671–679.

When the form of the transaction has not, in fact, altered any cognizable economic relationships, we will look through that form and apply the tax law according to the substance of the transaction. *Markosian v. Commissioner*, 73 T.C. 1235 (1980),[16] citing *Furman v. Commissioner*, 45 T.C. 360 (1966), affd. per curiam 381 F.2d 22 (5th Cir. 1967). This rule applies regardless of whether the entity has a separate existence recognized under State law (*Furman v. Commissioner, supra* at 365), and whether, in form, it is a trust, a common law business trust, or some other form of jural entity.[17] See concurring opinion of Judge Tannenwald in *Roubik v. Commissioner*, 53 T.C. 365, 381 (1969); *Noonan v. Commissioner*, 52 T.C. 907, 910 (1969), affd. per curiam 451 F.2d 992 (9th Cir. 1971); *Shaw Construction Co. v. Commissioner*, 35 T.C. 1102 (1961), affd. 323 F.2d 316 (9th Cir. 1963).

In the instant case, although in form the transfer of the property to Buena allegedly altered the economic relationship of petitioners to the property transferred, in substance it did not do so. This is because Buena, itself, cannot be recognized as a viable entity for tax purposes.

In form, Buena had a foreign creator (Lloyd) and a foreign trustee (Sunnyside) to administer the business trust. However, in substance it is clear that petitioners were not only the creators and grantors of Buena but were also the trustees of Buena. In determining the settlors of a trust, we look beyond the named grantors to the economic realities to determine the true grantor. *Stern v. Commissioner*, 77 T.C. 614 (1981); *Bixby v. Commissioner*, 58 T.C. 757 (1972). We believe that this rule is equally applicable in determining the true creator of a common law business trust. Compare *Stern v. Commissioner, supra*. Looking at the economic realities, it is clear that petitioners are the true creators and grantors of Buena.

Lloyd, the nominal creator of all the trusts, was an individu-

---

[16]Petitioners argue that *Markosian v. Commissioner*, 73 T.C. 1235 (1980), is inapplicable since it dealt with an ordinary trust, whereas the instant case deals with a business trust. We disagree. *Markosian* stands for a much broader principle that where an entity is purportedly created under State law, but does not alter any cognizable economic relationships, it will not be recognized. It is not limited to ordinary trusts and has equal applicability to the entity purportedly created by petitioners.

[17]It is therefore unnecessary to decide whether the common business trusts would have been recognized under State law.

al unknown to petitioners before they went to the British West Indies to execute the trust documents which they had obtained in Alaska. Lloyd had nothing to do with the preparation of the documents or the terms thereof. Nor did he pay any of the expenses of creating the trusts or contribute anything to them. After the trustees were named, Lloyd had nothing to do with the management or operation of the trusts. On the other hand, petitioners adopted the preprepared terms of the trusts and the documentation thereof which provided the plans to implement the trusts, and transferred to the trusts, directly or indirectly, the only properties they ever had.

It is also clear that petitioners were the true trustees of Buena. The nominal trustee of Buena, as well as of Medford, was Sunnyside, another of the trusts purportedly established by petitioners, which was a mere shell. Petitioners were the trustees of Sunnyside and were the only natural persons that could act for the trustees of any of the trusts. Petitioners were also the agents of Buena and Medford. Thus, as trustees of Sunnyside and agents of Buena and Medford, petitioners stood in exactly the same position with respect to the properties transferred to Buena as they did before the transfer. They had complete control of the actions and properties of all three trusts, including Buena, and had the right to distribute the income and corpus of the trusts to whomever they chose, including themselves. Accordingly, in 1978, petitioners transferred $20,820 of Buena's funds to themselves after first funneling it through Medford. Thus, it is clear that petitioners were authorized to and did receive the payments on the installment sales contracts just as they had before the transfer to Buena.[18] See *Bixby v. Commissioner, supra.*

We also note that the transfer of the property to Buena did not create rights in anyone else in the transferred assets. While the units of beneficial interests purportedly represented the beneficiaries of the trusts, they did not give the holders thereof any rights in the properties of the trusts, or in the management thereof or distribution of their income and

---

[18]Although some of this money distributed to petitioners was apparently attributable to a sale of a one-fifth interest in a Wisconsin farm (see note 13 *supra*), the record does not reveal how much of the payments received by petitioners was attributable to this sale. The transaction is not reflected on petitioners' 1978 joint income tax return.

corpus. The only rights they represented were to receive distributions of the properties of the trusts upon their termination. The attributes of these units were meaningless, as evidenced by the fact that they were passed around between the petitioners and the trusts for a maximum of $1 per unit and as little as 25 cents per unit. In fact, petitioners gave their 100 units in Sunnyside, which never owned more than $100, to Lloyd, a total stranger, for nothing. It is clear from their testimony that petitioners did not intend that any of the assets of any of the trusts would ever come into the possession of anyone other than petitioners and their children.

In summary, we find that Buena, Medford, and Sunnyside were all paper entities structured solely to avoid taxes. The fact that they purported to be foreign business trusts does not give them vitality nor does the fact that petitioners added additional layers of paper creating a tier structure of trusts change our conclusion. Since the creation of Buena did not alter any cognizable economic relationship, we will look through the form and apply the tax law according to the substance of the transaction. In substance, 'petitioners remained the owners of the property purportedly transferred to Buena and accordingly are taxable on the income derived therefrom.[19]

---

[19]Petitioners argue on brief that the sham theory should be disregarded because the issue was not raised by respondent in his notice of deficiency, in any pleading in the Tax Court, or at trial, and that petitioners have been prejudiced thereby. We disagree. The notice of deficiency states that the Government's position is that—

"The interest [received by Buena] is includible in [petitioners'] gross income in accordance with section 61(a)(4) of the Internal Revenue Code.

"An alternative position is that if the interest has been included in the income of a trust organization and if the trust organization was found to be a valid trust, then the trust would be a grantor trust and the interest is includible in your gross income in accordance with section 671 of the Internal Revenue Code."

Also, in his motion to compel production of documents, respondent stated his belief to be that petitioner controlled Buena and Medford and used those trusts to circle moneys taxable to petitioners into those trusts and back to petitioners in an attempt to avoid taxation of this income to petitioners. And since petitioners did not specifically mention the issue in their petition, it was unnecessary for respondent to mention it specifically in his answer.

Although the notice of deficiency is not a model of clarity, and there is some indication that respondent was uncertain about which theory to rely on, we believe the notice did sufficiently apprise petitioners that respondent would rely on the sham theory as well as the grantor trust provisions. The sham argument made by respondent is consistent with the broad language used in the notice of deficiency to tax petitioners directly on the interest income received by Buena. If a notice of deficiency is broadly worded and the Commissioner later advances a theory not inconsistent with that language, the theory does not constitute

## FINDINGS OF FACT

### *Issue 2. Section 212 Deduction*

In August 1977, petitioner paid $10 as a fee to join the American Law Association (hereinafter A.L.A.) and $8,000 to attend a seminar presented by A.L.A. in Anchorage, Alaska. At the seminar, petitioner received a package of materials which included preprinted forms for establishing common law business trusts, preprinted minutes and trust certificates and numerous excerpts from cases, legal commentary, newspaper articles, and other materials regarding trusts. The fee paid by petitioner also entitled him to use the A.L.A. tax and law library with paralegal assistance provided by A.L.A.

Petitioner incurred additional expenses of $211.86 for airfare to the A.L.A. seminar held in Anchorage, Alaska. Petitioner paid an additional $100 to an organization called "ATES" for information on the proper means to assign payments on the real estate deeds of trust and contracts from themselves to Buena. Petitioners later paid an additional $249.27 for airfare to fly back to Alaska to make sure the assignments of the real estate deeds of trust and contracts were proper.

Petitioner also incurred travel expenses of $547.75 in flying to Bryant, Tex., to obtain the necessary documents to set up the common law business trusts and in flying to the Turks and Caicos Islands to set up the organizations.

Petitioners established the business trusts to change the form in which the title of their property was held, to reduce taxes, to avoid probate costs, and because they believed the business trusts might be judgment-proof and would continue after death.

---

new matter. *Sorin v. Commissioner*, 29 T.C. 959 (1958), affd. per curiam 271 F.2d 741 (2d Cir. 1959).

Therefore we conclude that respondent's sham argument does not constitute new matter and is properly before the Court.

Furthermore, we have looked primarily to the documents that purportedly created Buena, supplemented by petitioners' evidence of what took place, to conclude that Buena should not be recognized for tax purposes. Petitioners have suggested no evidence, short of showing that the operative provisions of the Buena trust were really different from those expressed in the documents themselves, that might change our conclusion. Thus, petitioners have not been prejudiced by respondent and our reliance on the sham argument. See *Nat Harrison Associates, Inc. v. Commissioner*, 42 T.C. 601, 617 (1964).

Petitioners claimed a deduction of $9,113[20] on their 1977 return for the above items as amounts paid for "financial consultance [sic]." In the notice of deficiency, respondent disallowed the deduction in its entirety.

## OPINION

### Issue 2

The second issue is whether petitioners are entitled to deduct the $8,010 paid to A.L.A. under section 212.[21] Petitioners contend that they are entitled to deduct the $8,010 paid to A.L.A. under sections 212(1), 212(2), and 212(3).

Section 212(1) allows a deduction for expenses paid for the production or collection of income. Petitioners have the burden of proof on this issue. Rule 142(a).[22] In the instant case, petitioners have totally failed to show that the amounts were paid to A.L.A. for the production or collection of income. Rather, the evidence presented by petitioners shows that the amounts were paid to A.L.A. to reduce taxes, to avoid probate, and because they believed the trusts might be judgment-proof and would continue after their deaths. Such amounts therefore cannot be said to have been paid for the production or collection of income.

Section 212(2) allows a deduction for expenses paid for the management, conservation, or maintenance of property held for the production of income. Petitioners, in return for the $8,010 paid to A.L.A., received a package of materials which included preprinted forms for establishing common law business trusts, preprinted minutes and trust certificates, and numerous excerpts from cases, legal commentary, newspaper articles, and other materials regarding trusts. There is no probative evidence that such materials in any way related to the management, maintenance, or conservation of income-

---

[20]The various amounts expensed by petitioners totaled $9,018.88. The record does not reveal why petitioners claimed a deduction of $9,113.

[21]Petitioners have apparently conceded that the amounts incurred in flying to Texas to pick up the common law business trust documents, in flying to the A.L.A. seminar in Anchorage, Alaska, and in paying ATES for information on the proper manner for assigning title of the property to the business trusts are nondeductible. We agree, for the same reasons set forth in our discussion of the $8,010 paid to A.L.A.

[22]All Rule references are to the Tax Court Rules of Practice and Procedure.

producing property. Rather, the materials related to the manner in which petitioners could realize their objectives of reducing taxes, avoiding probate, and ensuring that the trusts would continue after their deaths. See *Epp. v. Commissioner*, 78 T.C. 801 (1982).[23] Therefore, petitioners are not entitled to the deduction under section 212(2).

Section 212(3) allows a deduction for amounts paid in connection with the determination, collection, or refund of any tax. Generally, ordinary and necessary expenses paid for Federal income tax planning are deductible under section 212(3). *Merians v. Commissioner*, 60 T.C. 187 (1973); *Collins v. Commissioner*, 54 T.C. 1656 (1970). Petitioners admittedly incurred the $8,010 expense with A.L.A. for several purposes. Of all of these, only one—for advice to reduce taxes—arguably falls within section 212(3). To the extent petitioners incurred the expense to change the form in which the title to their property was held, to avoid probate costs, to become judgment-proof, and to ensure that the trusts would continue after their deaths, it cannot be said that such amounts were expended for the determination, collection, or refund of any tax. *Epp v. Commissioner, supra.*

Petitioners have the burden of proving what portion, if any, of the expense is allocable to a deductible expense under section 212(3). Rule 142(a). Petitioners have failed to present any basis by which we can allocate any portion of the payment to such purpose. See *Epp v. Commissioner, supra.* Therefore, even assuming the money paid to A.L.A. for advice on how to reduce taxes qualified as a deduction under section 212(3), we must deny the deduction in its entirety.[24]

---

[23]Petitioners' vague belief that the trusts might be judgment-proof and therefore might conserve the income-producing property transferred to the trusts is not sufficient to fit these expenses within sec. 212(2). There was no evidence that petitioners were the subject of any suit or that they would be in the foreseeable future. Furthermore, petitioners' belief that the trusts would avoid probate costs is not enough to qualify the expenses for a deduction under sec. 212(2). Even if the creation of the business trusts would save some probate expenses, this would benefit petitioners' estate and thus would not help to conserve income-producing property while held by petitioners. See *Epp v. Commissioner*, 78 T.C. 801 (1982).

[24]We do not imply that the funds expended for the package of materials were ordinary and necessary, or if they were, whether they were in fact for tax planning under sec. 212(3).

## FINDINGS OF FACT

### *Issue 3. Charitable Contribution*

In 1977, petitioners moved from Wisconsin to Washington. At that time, petitioners donated some furniture and clothing to the Salvation Army. Petitioners estimated that the fair market value of the donated items was $110.38.

## OPINION

### *Issue 3*

The third issue is whether petitioners are entitled to a charitable contribution for furniture and clothing donated to the Salvation Army.

Where a charitable deduction is made in property other than money, section 170 allows a deduction for the fair market value of the property at the time of the contribution. Sec. 1.170A–1(c)(1), Income Tax Regs. The question as to fair market value is one of fact (*Estate of DeBie v. Commissioner*, 56 T.C. 876, 894 (1971)), and petitioners bear the burden of proof of establishing the fair market value. Rule 142(a).

In the instant case, the only evidence presented by petitioners was their testimony that they donated some furniture and clothing to the Salvation Army and that its fair market value was $110.38. No supporting documentation from the Salvation Army was provided to establish petitioners' donations. Nor do we know what type of furniture or clothing was donated or its condition. We believe petitioners donated property to charity when they moved to Washington; however, petitioners' estimate and the evidence presented are clearly insufficient to establish the exact fair market value of the donated property. Bearing heavily against petitioners whose inexactitude is of their own making, we find that the fair market value of the donated property was $50 (see *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930)), and petitioners are entitled to a deduction for such amount.

## FINDINGS OF FACT

### *Issue 4. Casualty and Theft Loss*

In 1976, the basement of petitioners' Wisconsin residence was flooded by a rainstorm. Several items of personal property

were damaged including three Samsonite suitcases, a sofa, a chair, clothing, books, pictures, eight-track stereo tapes, and other items.

Petitioners estimated that the loss totaled $578. None of the loss was covered by insurance. After deducting $100, petitioners claimed a casualty loss of $478 which respondent disallowed.

In 1977, petitioners' Washington residence was burglarized. Petitioners filed and settled a claim with their insurance company for the loss. Subsequently, petitioners discovered that additional items had been stolen or damaged. Petitioners did not receive insurance proceeds for these amounts since they had already settled their claim. Petitioners determined that the value of the items for which they did not receive insurance reimbursement was $3,031. After subtracting $100, petitioners claimed a casualty loss of $2,931, which respondent disallowed.

OPINION

*Issue 4*

The fourth issue is whether petitioners are entitled to a casualty loss under section 165 for a loss incurred in a flood and for a theft loss. Section 165(a) provided that there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. This covers both casualty losses and theft losses. See secs. 165(c)(3) and 165(e). Section 165(b) provides that the basis for determining the amount of the deduction for any loss shall be the adjusted basis of the property. Petitioner has the burden of proving the adjusted basis of the property. Rule 142(a). With respect to both the 1976 and 1977 claimed losses, respondent asserts that petitioner has failed to establish the adjusted basis of the property involved. We agree.

Petitioners presented no evidence to establish the adjusted basis of the property damaged in the 1976 flood or the property stolen in 1977. No testimony was presented to establish that the property was purchased, its cost, or any other relevant information. Where a taxpayer fails to establish his cost or other basis of the property involved, no casualty loss deduction is allowable. *Millsap v. Commissioner*, 46 T.C. 751, 760 (1966),

affd. 387 F.2d 420 (8th Cir. 1968). Petitioners have utterly failed to meet their burden of proof, thus no deduction is allowed for either the flood damage or theft loss.

FINDINGS OF FACT

## Issue 5. Expenses for Production of Income

In 1977, petitioners traveled to Alaska for the purpose of repairing real property owned by them. Petitioners paid $40 to State Security Patrol to watch their Washington home while they were away in Alaska.

While in Alaska, petitioners were notified that their Washington home had been burglarized. Petitioners immediately flew home incurring expenses of $277.84 for airfare and $44.53 for car rental in Seattle. Petitioners also incurred an expense of $516 in shipping their motor home from Alaska to Washington.[25]

Petitioners paid $25 for advertising expenses and telephone charges incurred in their attempts to sell the Alaska property.

In 1977, petitioners returned to Alaska in an unsuccessful attempt to sell a different parcel of real estate owned by them and incurred expenses in airfare of $480.

On their 1977 return, petitioners claimed a deduction of $1,389 under section 212.[26] In the notice of deficiency, respondent disallowed the deduction in its entirety.

OPINION

## Issue 5

The fifth issue is whether petitioners are entitled to a deduction under section 212 for the amounts incurred to prepare real property held by them for sale. Petitioners assert that they went to Alaska to prepare their investment real property in Alaska for sale and that the costs of the trip to and from Alaska bore a reasonable relationship to the ownership

---

[25]Since petitioner had to return to the Washington home immediately, they flew back and had their motor home, which they had driven to Alaska, shipped back.

[26]The various amounts expended by petitioners totaled $1,383.37 ($40 + $277.84 + $44.53 + $516 + $25 + $480). The record does not reveal why petitioners claimed a deduction of $1,389.

of the properties, and are deductible under section 212. Respondent counters that petitioners have failed to show that the properties were held for the production of income or that the expenses incurred were ordinary and necessary. We agree that petitioners have failed to show that the properties held in Alaska were held for the production of income.[27]

As noted above, petitioners have the burden of proof to show that the property was held for the production of income. Rule 142(a). In the instant case, petitioners offered absolutely no testimony or other evidence to establish that the property was held for the production of income. Accordingly, we must sustain respondent's determination on this issue.

FINDINGS OF FACT AND OPINION

*Issue 6. Negligence Addition to Tax*

The final issue is whether petitioners are liable for an addition to tax for 1977 and 1978 under section 6653(a) for negligence.

The burden of proof with respect to this issue is on petitioners. *Hatfield v. Commissioner*, 68 T.C. 895 (1977). The record indicates that petitioners did not make reasonable inquiry as to the income tax validity of their actions.[28] On the record before us, we must sustain respondent's determination. *Bixby v. Commissioner*, 58 T.C. 759, 792 (1972). Accordingly, the addition to tax under section 6653(a) for 1977 and 1978 was properly determined.[29]

*Decision will be entered under Rule 155.*

---

[27]It is therefore unnecessary to decide whether the expenses incurred were ordinary and necessary.

[28]In fact, the evidence indicates that when petitioners had their 1977 return prepared by their certified public accountant, he advised petitioners that he believed the transfer of the deed of trusts on the real properties would accelerate the gain on the installment notes resulting in income to petitioners in 1977. Petitioners ignored this advice.

[29]See *Gonsky v. Commissioner*, T.C. Memo. 1981-76.