NANCY L. TRENERRY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Trenerry v. Commissioner
Docket No. 5570-91
United States Tax Court
T.C. Memo 1994-500; 1994 Tax Ct. Memo LEXIS 508; 68 T.C.M. (CCH) 897; October 11, 1994, Filed *508 Decision will be entered under Rule 155. In 1973, a partnership (A-I) was formed, with petitioner (P) as the only general partner; and A-I bought an apartment complex. In 1976, A-I redeemed the interests of the limited partners, so that P owned the business and hence the apartment complex. In 1982, limited partners joined P to form partnership A-II; P contributed the apartment complex to A-II; and P contributed her A-II interest to a newly formed revocable trust (T-I), of which P was the trustee. In 1984, the A-II limited partners transferred their A-II interests to T-I; A-II sold the apartment complex to third parties and took a note; P revised the trust instrument and renamed the trust (T-II); and P assigned the note to T-II. In 1986, a business trust (BT-I) was created in Turks and Caicos Islands; a corporate Turks and Caicos Islands trustee (CT-I) was appointed trustee of BT-I; and petitioner received units in BT-I in exchange for the note (which supposedly had been held by T-II). In early 1987, P caused CT-I to be replaced as BT-I's trustee by CT-II, another corporate Turks and Caicos Islands trustee; P exchanged her BT-I units for units in another Turks and Caicos Islands *509 business trust (BT-II); and CT-II was appointed trustee of BT-II. In late 1987, BT-I sold the note to a third party for cash. P concedes that she is taxable on income of A-I, A-II, T-I, and T-II. Held: BT-I and BT-II are shams; the interest received on the note in 1986 and 1987, and the capital gain on the sale of the note in 1987, are taxable to P. Nancy L. Trenerry, pro se. For respondent: Cathleen A. Jones and Leann Page Drummond. CHABOT
CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax and additions to tax under sections 6651[1] (failure to file timely tax returns), 6653(a) (negligence, etc.), and 6654 (failure to pay estimated tax) against petitioner as follows: Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6651
6653(a)(1)
6653(a)(2)
1983
$ 24,500
$ 6,125
$ 1,225
n1
1984
30,590
7,648
1,530
n1
1985
30,394
7,599
1,520
n1
1986
29,566
7,392
--
--
1987
100,545
25,136
--
--
Additions to Tax
Sec.
Sec.
Sec.
Year
6653(a)(1)(A)
6653(a)(1)(B)
6654
1983
--
--
$ 1,499
1984
--
--
1,924
1985
--
--
1,741
1986
$ 1,478
[1] *510 1,430
1987
5,027
[1]
5,430
After concessions [2] *511 by both parties, the issues for decision are as follows: (1) Whether certain "common law contractual business trust organizations" [3] were sham entities which had no purpose or economic substance aside from being employed as part of a tax avoidance scheme and are to be disregarded for income tax purposes, and the interest income and capital gain arising from a note attributed to those organizations are taxable to petitioner. (2) If the common law business trust organizations are recognized for tax purposes, then whether the interest income and capital gain arising from a note attributed to those entities are taxable to petitioner under the grantor trust rules of sections 671-677. (3) If the common law contractual business trust organizations are recognized for tax purposes, then whether the interest income and capital gain arising from a note attributed to those entities are taxable to petitioner under the foreign trust rules of section 679.
FINDINGS OF FACT Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this *512 reference. When the petition was filed in the instant case, petitioner resided in Claremore, Oklahoma. 1. Background
During the years in issue, petitioner resided in the State of Washington. On August 1, 1973, Auvil Investments, Ltd., a Washington partnership (hereinafter sometimes referred to as Auvil-I), was formed. (Auvil was petitioner's parents' surname.) Petitioner was the general partner and also was one of the three limited partners in Auvil-I. In October 1973, Auvil-I bought a 32-unit apartment complex (hereinafter sometimes referred to as the Apartment Complex) in Federal Way, Washington, from Edward L. Crosby and Marilyn D. Crosby (hereinafter sometimes referred to as the Crosbys). In April 1976, Auvil-I redeemed the interests of the limited partners, other than petitioner, for cash and deferred payments (monthly payments on interest-bearing notes due April 1, 1996). After the limited partners' interests were redeemed, Auvil-I filed a cancellation of its certificate of limited partnership. However, Auvil-I was not to be terminated until the redeemed limited partners were fully paid. Petitioner continued to operate the Apartment Complex under the name of *513 Auvil-I, albeit without partners. The income and expenses of the Apartment Complex were reported on Schedule E of petitioner's individual income tax returns for 1977 through 1980. On March 31, 1982, petitioner formed the Nancy Lee Trenerry Trust (hereinafter sometimes referred to as the Trenerry Trust), a revocable trust, of which she was both the grantor and the only trustee. [4] As trustee, petitioner's powers included the right to manage, sell, convert, or acquire trust property, and to use or distribute trust income and principal for or to petitioner (as grantor) during her lifetime. Petitioner's two children, Susan Lynn Trenerry Schmidt (hereinafter sometimes referred to as Susan) and Joan Trenerry (hereinafter sometimes referred to as Joan), held remainder interests in, and were possible successor trustees of, the Trenerry Trust. *514 Also on March 31, 1982, Auvil-I's partnership agreement was amended to form Auvil Investments, Ltd., a Washington limited partnership (hereinafter sometimes referred to as Auvil-II). Petitioner was the general partner and also was one of the three limited partners of Auvil-II. Susan and Joan were the other two limited partners. Susan and Joan each agreed to contribute $ 13,500 to Auvil-II. Petitioner contributed to Auvil-II the Apartment Complex, which was valued at $ 273,000, after mortgages and encumbrances. On August 25, 1982, petitioner, Susan, and Joan amended the Auvil-II partnership agreement to provide that any partner could freely assign her partnership interest to the trustee of a trust created for that partner's benefit. On September 16, 1982, petitioner transferred her general and limited partnership interests in Auvil-II to the Trenerry Trust, but (according to the transfer instrument) petitioner remained general manager of Auvil-II. On May 17, 1984, Zaran Sayre and Shirley Sayre (hereinafter sometimes referred to as the Sayres) agreed to buy, and Auvil-II agreed to sell, the Apartment Complex for $ 750,000. Shortly thereafter, Susan (on July 20, 1984) and Joan *515 (on July 25, 1984) assigned and transferred their Auvil-II limited partnership interests to petitioner, as trustee of the Trenerry Trust. On July 25, 1984, Auvil-II filed a Cancellation of Certificate of Limited Partnership Agreement, resulting in Auvil-II's dissolution. Nevertheless, petitioner continued to sign documents as general partner of Auvil-II after that date. On July 31, 1984, Auvil-II sold the Apartment Complex to the Sayres who, in turn, executed a $ 750,000 promissory note with wraparound provisions (hereinafter sometimes referred to as the Note) to Auvil-II. On the same day, Auvil-II conveyed the Apartment Complex to the Sayres by a statutory warranty deed, which listed many interests to which the Sayres' interest was subject. One of these superior interests was Auvil-I's obligation to the Crosbys, the unpaid principal of which had been reduced to $ 91,641.75 as of August 1, 1984. Under the statutory warranty deed, Auvil-II agreed that it (and, presumably, not the Sayres) was to pay the obligation to the Crosbys. On August 15, 1984, petitioner, as grantor, changed the name of the Trenerry Trust to the Jennville Trust. This change in name was made "in memory *516 of the Trustor's parents, Fay Glover Jennings Auvil and Jesse Hubert Auvil." Although the amending document revised various provisions of the trust agreement, Susan and Joan (whose name at that time was Joan Trenerry Crews) continued to hold remainder interests, and also to be possible successor trustees. The last paragraph of the amending document provides as follows: 9. Trustor [petitioner] urges Trustees to beware of attorneys and to avoid them whenever [sic] at all possible. Mention of "attorneys" is hereby deleted from this agreement. Substitute "advise [sic] of counsel" wherever "attorneys" is mentioned.
On September 5, 1984, petitioner, as general partner of Auvil-II, assigned the Note to the Jennville Trust. In the assigning document, the Jennville Trust is consistently referred to (in five places) as "Jennville Charitable Trust", a term that does not appear in the August 15, 1984, amending document. The assignment of the Note was accepted for the Jennville Trust by petitioner and Joan as trustees, but the record does not indicate when Joan became a trustee. The assigning document states that the Note had a then-remaining principal balance of $ 748,347.21, and *517 that the Sayres acknowledge that they are thereafter to make payments to the Jennville Trust. The assigning document provides that the Jennville Trust is thereafter to make payments on the obligation to the Crosbys, and states that the unpaid principal of this obligation had been reduced to $ 90,149.51 by September 5, 1984. Petitioner had control of all income received on the Note until March 12, 1986, and was liable for all income tax associated with this income. 2. Creation of Liberty Holding Co.
Nassau Life Insurance Co., Ltd. (hereinafter sometimes referred to as Nassau Life), was incorporated on January 25, 1978. On March 12, 1986, Liberty Holding Co. (hereinafter sometimes referred to as Liberty), a common law contractual business trust, was created by a contract (hereinafter sometimes referred to as the Contract) in Grand Turk, Turks and Caicos Islands, British West Indies. The parties to the Contract were Walter R. Simons (hereinafter sometimes referred to as Simons), "the CREATOR", and Cynthia A. Francis (hereinafter sometimes referred to as Francis), "the EXCHANGOR". Under the Contract, Simons appointed Nassau Life as trustee, to "control and administer all *518 assets of the Company [Liberty] to the best of its ability for the Certificate Holders." The Contract was signed by Simons, by Francis, and, on behalf of Nassau Life, by Veronica D. Williams. [5] Liberty is domiciled in Grand Turk. Petitioner did not know either Simons or Francis; neither did she know any of the officers of Nassau Life. Also on March 12, 1986, pursuant to paragraph 6 of the Contract, a certificate for 100 Capital Units (hereinafter sometimes referred to as Units) of Liberty was issued to Francis in exchange for $ 100; on that same day Francis transferred 99 Units back to Liberty. One Unit was retained by Francis. Also on March 12, 1986, Nassau Life appointed petitioner and Joan as Liberty's president (agent) and secretary (agent), respectively. Also on March 12, 1986, a certificate for 74 Units was issued to petitioner and was *519 described in Liberty's minutes as being in exchange for $ 100 "and other items of value as listed on Schedules A and B hereof." The minutes were signed by Eldon Samuel Anderson, as Nassau Life's executive vice president, and by petitioner and Joan. The record does not show the above-referenced Schedules A and B. The remaining 25 Units of Liberty were never issued. 3. Petitioner's Later Transactions With Liberty
On March 21, 1986, the Jennville Trust assigned the Note to Liberty. Petitioner and Joan signed this assigning document as the Jennville Trust's trustees. (Again, the Jennville Trust is consistently referred to in this assigning document as "Jennville Charitable Trust".) Petitioner and Joan also signed this assigning document as Liberty's president (agent) and secretary (agent), respectively. No one else signed this assigning document on behalf of the Jennville Trust or Liberty. This assigning document states that the Note had a then-remaining principal balance of $ 745,476.44, and that Liberty is thereafter to make payments on the obligation to the Crosbys. The Note was the substantial part of the property that petitioner exchanged for 74 Units of Liberty. *520 Also on March 21, 1986, the Trenerry Trust borrowed $ 31,740 from Liberty, pledging as collateral security real property in Texas. The deed of trust, signed by petitioner as trustee for the Trenerry Trust, [6] conveys the property to Nassau Life, as trustee for Liberty. 4. Replacement of Nassau Life as Trustee
On January 1, 1987, Nassau Life tendered its resignation as Liberty's trustee, to take effect January 31, 1987; and Nassau Life appointed petitioner and Joan as successor, or contingent, trustees of Liberty. On February 1, 1987, petitioner and Joan, as Liberty's contingent trustees, appointed Century Trust Co. Ltd. (hereinafter sometimes referred to as Century Trust), as trustee for Liberty. On the same day, petitioner and Joan resigned as Liberty's contingent trustees. Century Trust, which had been incorporated under the laws *521 of the Turks and Caicos Islands on April 24, 1986, accepted its appointment, accepted petitioner's and Joan's resignations as contingent trustees, and appointed petitioner and Susan as Liberty's president (agent) and secretary (agent), respectively. 5. Steward Co.
Steward Co. (hereinafter sometimes referred to as Steward) was a company similar to Liberty. Century Trust, Liberty's trustee, was also Steward's trustee. On February 1, 1987, petitioner exchanged her 74 Units of Liberty for 100 units of Steward. Petitioner is the only unit-holder of Steward. 6. Petitioner as President of Liberty
Petitioner acted as president (agent) of Liberty from its inception. As president (agent) of Liberty, petitioner's duties included signing checks; executing real estate deeds; endorsing, buying, selling, signing or otherwise transferring securities, stocks, bonds, notes, or money fund accounts; and signing any other required legal documents. Petitioner set up, maintained, and was signatory for Liberty's U.S. bank accounts. As president (agent) of Liberty, petitioner received and deposited into Liberty bank accounts the payments made by the Sayres on the Note. Petitioner *522 continued to conduct Liberty's affairs throughout 1987 even though she no longer held Units of Liberty. Petitioner signed the checks (dated April 1, 1987, and August 12, 1987) drawn on Liberty's bank accounts to pay the real estate taxes for the Apartment Complex. 7. Sale of the Note
On December 16, 1987, Centrum Financial Services, Inc. (hereinafter sometimes referred to as Centrum), offered to buy the Note from Liberty for $ 400,000. Under the terms of the offer, Centrum would pay $ 400,000 cash to the holder of the Note on closing, which was to take place no later than December 31, 1987. Petitioner, as president (agent) of Liberty, accepted Centrum's offer. On December 24, 1987, Centrum sent a letter to the Sayres asking them to verify the balance owed on the Note. The letter, signed "Sent without signature to avoid delay", states as follows: Nancy Trenerry wishes to close the transfer prior to the end of the year and I would therefore appreciate your prompt attention to this matter.
On December 28, 1987, Liberty assigned to Centrum the Note and the Deed of Trust. The only signatures on this assigning document were those of petitioner and Susan, as Liberty's *523 president (agent) and secretary (agent), respectively. Also on December 28, 1987, petitioner and Susan, as Liberty's president (agent) and secretary (agent), respectively, notified the Sayres of the assignment and directed the Sayres to make future payments to Centrum. As Liberty's president (agent), petitioner was entitled to compensation by Liberty for her services, but the only payment "of significance" that petitioner remembers is for per diem and expenses on account of her trip to the coast in connection with the sale of the Note. 8. Miscellaneous
Apart from the interest and capital gain on the Note, which are in dispute, the parties have agreed to dispose of the 1986 and 1987 notice of deficiency determinations as shown in table 1. Table 1 Notice of Parties'
Item
Deficiency Adjustment Agreement 1986
Interest  $ 19,904 $ 19,904 Annuity  10,596 10,596 Personal exemption  (1,080)
(1,080)
Net rental income  -0-  (3,188)
Itemized deductions  -0-  (7,003)
Capital gains  and losses -0-  (3,000)
1987
Interest  746 746 Annuity  10,716 10,716 Personal exemption  (1,900)
(1,900)
Itemized deductions  (2,540)
(7,616)
Capital gains  and losses -0-  [1]
*524 Interest received on the Note amounted to $ 55,621 for 1986 and $ 73,112 for 1987. The 1987 sale of the Note to Centrum resulted in a capital gain of $ 273,461. [7]
As grantor and trustee, petitioner did not file fiduciary income tax returns for the Trenerry Trust or the Jennville Trust. As both general and limited partner, petitioner did not file partnership tax returns for Auvil-I or Auvil-II. Petitioner did not file individual income tax returns for any of the years in issue. Liberty and Steward are shams, the separate existence of which may be disregarded for income tax *525 purposes. The interest income and capital gain on account of the Note, purportedly received by Liberty, are properly attributable to petitioner. OPINION Respondent contends that the interest income (1986 and 1987) and capital gain (1987) from the Note are taxable to petitioner under three alternate theories as follows: (1) Petitioner was the owner of Liberty under the grantor trust rules of sections 671 through 677, (2) petitioner was the owner of Liberty under the foreign grantor trust rules of section 679, or (3) Liberty was a sham entity that should be disregarded for Federal income tax purposes. Petitioner contends that the income from the Note is not taxable to her because: (1) She relinquished ownership of the Note to Liberty on March 12, 1986, (2) Liberty was a valid, legal entity which acquired legal and equitable title to the Note, and (3) the income derived from the Note is attributable to Liberty. Petitioner contends that her actions were as agent of Liberty and that they do not cause Liberty's income to be attributable to her. We agree with respondent that the disputed income is taxable to petitioner because Liberty was a sham entity that is to be disregarded for *526 tax purposes. Respondent's notice of deficiency determinations as to matters of fact are presumed to be correct. Petitioner has the burden of proving that the interest income and capital gain are not taxable to her. [8] Rule 142(a); [9]Welch v. Helvering, 290 U.S. 111, 115 (1933). *527 We must decide whether the interest income and capital gain generated by the Note are attributable to Liberty or to petitioner. We shall treat respondent's third argument first because if Liberty is a sham, then it is unnecessary to consider the other arguments. If Liberty is a sham to be disregarded for income tax purposes, then income tax liability will be determined as though Liberty had never been created. Section 61(a)[10] provides that gross income includes interest and gains from dealings in property. Petitioner does have a legal right to minimize her taxes. Gregory v. Helvering, 293 U.S. 465, 469 (1935). However, this right does not bestow upon petitioner a right to structure paper entities to avoid taxation when those entities are without economic substance. Zmuda v. Commissioner, 79 T.C. 714, 719 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). *528 We conclude that, under Zmuda, Liberty's separate existence will be disregarded for tax purposes. This conclusion is based on the combined effect of the following elements: (1) As far as we can tell from the record in the instant case, the only significant asset of Liberty was the Note, which petitioner contributed. (2) Similarly, the only income is that which arose from the Note -- interest and, on sale, capital gain. Thus, apart from reacting to an offer to buy the Note, Liberty did not conduct any but the most passive of activities. (3) Petitioner was the president (agent) of Liberty and, as far as we can tell, every business transaction carried out in the name of Liberty was done either directly by petitioner, or at her direction. (4) Unlike the taxpayer in Zmuda, petitioner was not Liberty's trustee. However, petitioner did determine who the trustee should be and did replace the trustee. Also everything that was done by Nassau Life or by Century Trust appears to have been done at petitioner's instance. Petitioner did not present any evidence -- documentary or testimonial -- that any trustee of Liberty did anything of consequence. Petitioner, as Liberty's *529 president (agent), would be expected to have access to Liberty's records and to the responsible personnel of Nassau Life and Century Trust, but petitioner failed to present either records or testimony. We may fairly conclude that those records or personnel would have shown that petitioner had all the control that a real trustee could be expected to have. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). We conclude that the additional entities purportedly separating petitioner from Liberty were merely "additional layers of paper" which did not give validity to the entities. Zmuda v. Commissioner, 731 F.2d at 1420, affg. 79 T.C. at 722. Thus, this distinction in form between Zmuda and the instant case is not a distinction in substance. (5) Petitioner's trial testimony as to her lack of control, involvement, and knowledge strikes us as contradictory and disingenuous. (a) Petitioner testified that she entered into the arrangement with Liberty and Nassau Life in order to relieve herself of responsibility *530 for the management and control of the Note. When petitioner was reminded about the parties' stipulation as to her role for Liberty, the following colloquy occurred: Q [Jones] So you were looking for a company that would help you manage this property. Is that your testimony? A Not help me. Q Or that would manage it. A That would take over the management and control of the assets. Q Okay. In stipulation paragraph 38 we have agreed that as president of this company your duties included signing checks, executing real estate deeds, endorsing, buying, selling, signing or otherwise transferring securities, stocks, bonds, et cetera, signing any other legal documents or contracts. What exactly -- how exactly did this company relieve you of any burden? Other than these duties, what other duties were there of managing the property? A Practically everything except the mechanics of the paperwork that was left, and they had to have a U.S. agent. And, you know, at that point that particular part of it was routine with me, and a nominal amount of time and practically no responsibility. Q At this time the property that is in Liberty Holding Company is the note receivable. That is the *531 property they were holding. A What point in time? Q Well, as of March 12, 1986, the property that was transferred was the note receivable. A That was the major portion of the property that was transferred. Q And with respect to that piece of property, it is your testimony that there were significant responsibilities other than the responsibilities stipulated to in paragraph 38? A Well, an asset like had developed there supposedly needs to be managed and invested and reinvested and, at least in my mind, requires constant study and attention to the market and the political and economic developments, and there is a lot of decision-making in that area that I wanted to turn over to the management of the trustee.
The record does not show that Liberty, Nassau Life, or Century Trust did or decided anything with regard to the Note, other than what petitioner did or decided. The Note was held in trust by Liberty through late 1987, until it was sold to Centrum. Thus, we conclude that petitioner's "response" to respondents' last question was carefully designed to be a misleading nonresponse. (b) In form, Liberty sold the Note to Centrum and received about $ 400,000 in cash. *532 When respondent asked petitioner what happened to the cash, petitioner stated that she did not know, that "you need to go to the trustee of Liberty", i.e., Century Trust. Century Trust also was Steward's trustee. Petitioner also denied knowing whether anyone other than she owned units in Steward. Later, petitioner and the Court engaged in the following colloquy: THE COURT: What is the entity in which you hold certificates? THE WITNESS: At the present time I hold certificates in Steward Company. THE COURT: All right. In Steward Company are there any other certificate-holders? THE WITNESS: I can't answer that. THE COURT: Why can't you answer that? THE WITNESS: Because I am not the trustee. THE COURT: Is it that you don't know or is there some sort of restriction on your divulging information? THE WITNESS: There is no restriction as far as I know, but that is not part of the business I have knowledge to. I suppose I could go ask to look at the register. THE COURT: Ms. Trenerry, if Century Trust were to issue a million certificates to Steward Company and if that issuance was not in exchange for any investments, would that affect the value of your interest in Steward? *533 THE WITNESS: Of course. THE COURT: Then may I assume that it is of importance to you to know how many other certificates are outstanding and what the assets of Steward are? THE WITNESS: I hadn't really considered that. THE COURT: How do you know then that your daughters are being protected -- this estate that you wish to preserve for your daughters, and presumably in the interim, produce income for you? THE WITNESS: Well, I try to keep up with the reports of the trustee. And I haven't been as diligent as I should be of late. THE COURT: Well, Ms. Trenerry, as of the last time that you kept up with the reports of the trustee -- whether it was earlier this year or last year or two years ago, as of that last time, how many other certificates were outstanding? THE WITNESS: In Steward Company none that I know of.
We do not believe that petitioner really took so cavalier an attitude to the $ 400,000. We do not believe that she constructed all this gingerbread, took so active a role as Liberty's president (agent), took the trouble to change Liberty's trustee, specified a desire to have the Note sold before the end of 1987, took a trip to the coast in connection with the sale *534 of the Note (the only expense for which she was reimbursed), and then walled herself off from control over, and even knowledge of, what happened to the cash. (c) The following colloquy took place as to petitioner's income tax returns for 1986 and 1987: Q [Jones] With respect to the issues that we are discussing here, the interest income and the capital gain, you did not report that on any of your individual income tax returns for 1986 or 1987. A That is correct. Q Did you file returns for 1986 and 1987? A Just what we have stipulated to here during these deficiency proceedings. Q I don't believe we stipulated with respect to whether you filed or not for any of the years in question. A Well, that I don't admit or deny. Q Did you file any piece of paper with the United States with respect to income tax for any of the years in question? A That I don't admit or deny.
We are convinced that petitioner answered questions as a witness only to the extent she believed it was necessary to do so in order to avoid appearing absurd. We believe she misjudged the extent that was necessary. (6) Based on an analysis of the additions to tax, adjustments to income, and petitioner's *535 testimony (see supra (5)(c)), we conclude that petitioner failed to file individual tax returns for each of the years in issue (1983-1987). By conceding the additions to tax under section 6651(a) for each of the years in issue, petitioner has conceded that she did not file timely individual tax returns. The nature of the adjustments to income to which the parties have agreed, see supra table 1, makes it clear that the adjustments are not modifications of amounts that petitioner had reported. In addition to her failure to file individual income tax returns, petitioner testified that no income tax returns had ever been filed for the Trenerry Trust or the Jennville Trust.
From the foregoing, we conclude (1) that there was no nontax purpose for the creations of Liberty and Steward, and for the arrangements made with Nassau Life and Century Trust, (2) that no nontax functions were served by those creations and arrangements, and (3) that petitioner's purpose in so creating and so arranging was to use paper and distance in order to reduce the likelihood that respondent would realize that income subject to tax was not being reported. In accordance with Zmuda v. Commissioner, 79 T.C. 714 (1982), *536 affd. 731 F.2d 1417 (9th Cir. 1984), and the numerous opinions relying thereon, we conclude that Liberty's separate existence is to be disregarded for tax purposes [11] and the disputed interest income and capital gain are to be taxed to petitioner. Petitioner relies on two legal opinion letters of Joe Alfred Izen, Jr. (hereinafter sometimes referred to as Izen) [12] which she had obtained from Century. Izen's opinion letters, addressed to Century, dated September 25, 1986, discuss the legal status and tax status of contractual trust companies. Although Izen's opinion letters are dated almost 4 years after our published opinion in Zmuda (and more than 2 years after the published Court of Appeals affirmance), neither of his opinion letters refers to Zmuda. We note the August 15, 1984, changes to the Trenerry Trust, *537 in which petitioner (as grantor) warned herself (as trustee) "to beware of attorneys and to avoid them whenever at all possible." Perhaps this was one instance in which petitioner should have followed her own advice. The Izen opinion letters do not help petitioner on the evidence in the instant case. We hold for respondent. Our holding on the sham entities issue makes moot respondent's alternative grantor trust contentions. To take account of the parties' agreements on other issues, Decision will be entered under Rule 155. Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954, or the Internal Revenue Code of 1986, as in effect for the respective years in issue.↩
1. 50 percent of the interest due on the entire deficiency for each year. ↩
2. The parties have resolved all the issues for 1983, 1984, and 1985, as well as several of the issues for 1986 and 1987. Petitioner concedes all the additions to tax, except to the extent that the amounts of the additions are affected by the resolutions of the issues remaining in dispute and by the parties' settlement of the other adjustments.↩
3. The use in our findings and in our opinion of "common law contractual business trust organization", "partnership", "limited partnership", "trustee", and similar words is for narrative convenience only, following the form in which the various transactions are cast, and is not to be construed as a determination of the nature of any thing or act. See, e.g., Burrill v. Commissioner, 93 T.C. 643, 645↩ n.4 (1989).
4. The trust agreement for the Trenerry Trust states that "The assets described in Schedule A, attached hereto and made a part hereof, * * * shall constitute and henceforth be called the 'Trust Estate'." The record does not indicate what, if any, assets the Trenerry Trust had, other than petitioner's and her daughters' later contributed interests in Auvil-II. See infra↩.
5. See the description of the formation of Atram Trust, in Para Technologies Trust v. Commissioner, T.C. Memo. 1994-366↩ (slip op. at 7-8).
6. This is the term used in the deed of trust, even though the trust's name had been changed almost 2 years earlier to the Jennville Trust "in memory of the Trustor's parents".↩
1. Petitioner has a capital loss carryover available in the amount of $ 17,526. The amount of this carryover that may be allowable for 1987 depends on our resolution of the dispute on the 1987 sale of the Note.↩
7. The parties have not stipulated directly the amounts of the interest and capital gain. However, they have stipulated that interest income adjustments of $ 55,621 for 1986 and $ 73,112 for 1987, and a capital gain of $ 273,461 for 1987 are in dispute. The parties' contentions go only to taxability, and not to the amount. We conclude from this that the stated amounts are the actual amounts of the interest received and the gain realized.↩
8. In her opening brief, petitioner contends that respondent has the burden of proving that the income is attributable to petitioner. We believe the opinions that petitioner cites are properly distinguishable. In any event, our conclusion in the instant case is based on the preponderance of the evidence, so it is immaterial who has the burden of proof. Brookfield Wire Co., Inc. v. Commissioner, 667 F.2d 551, 553 n.2 (1st Cir. 1981), affg. T.C. Memo. 1980-321; Deskins v. Commissioner, 87 T.C. 305, 322-323↩ n.17 (1986).
9. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
10. Sec. 61(a) provides, in pertinent part, as follows: SEC. 61. GROSS INCOME DEFINED. (a) General Definition. -- Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: * * * (3) Gains derived from dealings in property; (4) Interest;↩
11. Neither side asks the Court to rule on the separate existence or pass-through status of Steward. Had we been asked, our ruling would be the same as that for Liberty.↩
12. For a discussion of Izen's activities in relation to Nassau Life, see Para Technologies Trust v. Commissioner, T.C. Memo. 1994-366 and T.C. Memo. 1992-575↩.