T.C. Memo. 1999-391


UNITED STATES TAX COURT


ALLEN O. ZACHMAN AND BERNADETTE ZACHMAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13252-91.                    Filed December 1, 1999.


<u>John R. Koch</u>, for petitioners.

<u>Tracy A. Martinez</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, <u>Judge</u>:    Respondent determined the following
deficiencies, additions to tax, and penalties with respect to
petitioners' Federal income tax liabilities:

|  |  | Additions to Tax and Penalties | | |
| --- | --- | --- | --- | --- |
| Year | Deficiency | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B)* | Sec. 6662(a)** |
| 1987 | $2,279 | $114 | 50% of the interest due on $2,279 | -- |
| 1988 | 2,912 | 146 | -- | -- |
| 1989 | 7,100 | -- | -- | $1,165 |

* Sec. 6653(a)(1)(B) was repealed for 1988.
** Sec. 6662(a) was enacted in 1989, generally effective for returns the due date for which is after Dec. 31, 1989.

The issues for decision are:

1. Whether Oak Hill Co. (Oak Hill), a putative business trust established by petitioners, should be disregarded for Federal income tax purposes because it lacks economic substance. We hold that it should.

2. Whether petitioners are liable for additions to tax for negligence pursuant to section 6653(a) for taxable years 1987 and 1988 and an accuracy-related penalty pursuant to section 6662(a) for taxable year 1989.[1] We hold that they are.

FINDINGS OF FACT

The parties have stipulated some of the facts, which are so found. The stipulated facts and associated exhibits are

---

[1] All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

incorporated by this reference.  Petitioners resided in Rogers, Minnesota, when they filed their petition.

For more than 46 years, petitioners have owned and operated a 235-acre dairy farm.  Petitioner husband also sells parts and silo loaders.

Prior to 1983, petitioners' farm assets, personal property, and real property were held in various trusts, including North Curve and Orange Run trusts, promoted by Lowell Anderson.[2]  In 1983, upon the advice and recommendation of James Noske and Norb Stelton, whom they had just met in a doctor's office, petitioners decided to transfer their assets into new "business trusts."  On November 9, 1983, petitioners executed a bill of sale whereby for stated consideration of "One dollar and other good and valuable consideration", they purported to transfer to Oak Hill their farm equipment and livestock.  On the same day, in their capacities as trustees for the North Curve and Orange Run trusts, petitioners purportedly conveyed and quitclaimed their interests in the farm real estate to Pleasant Acres Co. (Pleasant Acres).

---

[2] On Feb. 24, 1983, Lowell Anderson was indicted by a Federal grand jury in Wyoming for conspiring to defraud the United States by selling common-law trusts which were used to evade Federal income taxes.  See United States v. Tranakos, 911 F.2d 1422, 1424 (10th Cir. 1990).  Petitioners were issued a subpoena to testify before the grand jury regarding matters involving Lowell Anderson, but they were ultimately excused from testifying.  Lowell Anderson died while the criminal proceedings were pending.  See id.

Simultaneously, petitioners purportedly conveyed to Pleasant Acres three life insurance policies and an extensive assortment of personal property, including furniture, china, lamps, home appliances, and an encyclopedia.

Oak Hill and Pleasant Acres both purport to be business trusts formed pursuant to Minnesota law. The named trustees of each of these purported trusts are Parnell, Inc. (Parnell) and Armageddon, Inc. (Armageddon), nonprofit corporations organized under the laws of South Dakota. These corporations are also the named trustees for numerous other business trusts.

The Declaration of Trust of Oak Hill (Declaration of Trust), dated April 25, 1983, recites that it is made between Parnell and Armageddon, "herein referred to as Trustees, for the purpose of enabling the Trustees to hold and manage the trust estate and to carry on business as hereinafter provided." The Declaration of Trust further provides in pertinent part:

ARTICLE III. SHARES

SECTION 1. The beneficial interest in this trust shall be divided into shares without par value. Upon unanimous approval of the Board of Trustees, shares may be sold or exchanged for such consideration, and on such terms, as the Trustees deem proper. All shares shall be evidenced by trust certificates of which [sic] shall be signed by each of the Trustees.

SECTION 2. The certificates shall entitle owners thereof to participate proportionately in all dividends and other distributions of income or principal as the Trustees may, from time to time, in their absolute discretion, declare and pay out; provided that, upon the termination of

the trust, the Trustees shall distribute all of the property and accrued income to the certificate holders of record in proportion that the number of shares they own bears to the total number of shares issued and outstanding.

SECTION 3.  Any Trustee hereunder may acquire, hold and dispose of shares in this Trust to the same extent and in the same way as if he were not a Trustee and without affecting in any way his status or power as such.

SECTION 4.  No shares shall be issued in addition to those originally specified herein except as replacements for other certificate holders as authorized by this Declaration. The total number of shares outstanding shall not exceed 100 (one hundred) in number.

SECTION 5.  Transfers of shares shall be made only on the books of the business trust and the old certificate properly endorsed shall be surrendered and canceled before a new certificate is issued, provided that, no transfer shall be effective until approved by unanimous vote of the Board of Trustees.

*        *        *        *        *        *        *

SECTION 7.  The rights of trust certificate holders and other persons becoming entitled to shares of the trust shall be subject to all terms and conditions of this Declaration of Trust.  The shares shall not be personal property, and the ownership thereof shall not give any person any legal or equitable title in or to the trust property or any part thereof, but shall only entitle the owners of shares to their proportionate shares of dividends and distributions as herein provided.  No shareholders shall have any rights to manage or control the property, affairs, or business of the trust, or any power to control Trustees in these respects.  No shareholder shall have any right to a partition of the trust property or to an accounting during the continuance of the trust.  No part of the trust property or the income therefrom shall be liable for the debts of any trust certificate holder and no certificate holder shall have any power to sell, assign, transfer, encumber, or in any manner to anticipate or dispose of his shares or the income produced thereby, prior to the actual distribution in fact, by the Trustee to said certificate holder.

SECTION 8.  The death, insolvency or incapacity of any trust certificate holder shall not operate to terminate or dissolve the trust or affect its continuity ***.  If any certificate holder hereunder dies, becomes insolvent or is placed under any legal incapacity before the termination of this trust, his shares shall become null and void and shall immediately revert to the Board of Trustees, who shall thereupon name a replacement beneficiary or beneficiaries and issue a new certificate or certificates as provided in this Declaration.

ARTICLE IV.  BOARD OF TRUSTEES

SECTION 1. The business and property of the business trust shall be managed by Board of Trustees, who shall be the persons named in the Declaration of Trust, who shall serve until their successors are duly qualified.  In the event of the death, incapacity, resignation or retirement of any Trustee, a successor Trustee shall be appointed by the remaining Trustee or Trustees.

  *      *      *      *      *      *      *

SECTION 3.  The Trustees shall hold, in the trust name, legal and equitable title to all property, real and personal, and shall have absolute and exclusive power and control over the management and conduct of the business of the trust free from any right of control of any of the certificate holders.  The Trustees may hold, manage and dispose of the property and business of the trust in the same manner as if they were absolute proprietors thereof, subject only to the specific limitations herein contained. The Trustees shall have the power, without limitation, to purchase or otherwise acquire property, and to sell, exchange, lease, mortgage, pledge or in any manner dispose, encumber, improve or deal with the property of the trust, real or personal, or any part thereof, or any interest therein, on such terms and for such consideration as they deem proper. * * *

The Declaration of Trust, as well as various minutes for the board meetings of Oak Hill's trustees, bears the signatures of Cheryl A. Foshaug, president of Armageddon, and Marti Inman, president of Parnell.  Neither Foshaug nor Inman has ever met

petitioners or heard of Oak Hill.  Neither ever managed Oak Hill.

They each signed various papers, including blank or incomplete

pages, at the request of James or Joan Noske.  Foshaug often

neither read nor understood the pieces of paper she signed.  As

president of Parnell, Inman took no action other than as directed

by James or Joan Noske.[3]

The minutes for the Oak Hill trustees' meeting dated

September 14, 1983, signed by Foshaug and Inman, indicate that

the trustees appointed Daniel Strohmeier as manager of Oak Hill,

with authority to oversee the business operations of the trust

and to issue checks to pay general operating expenses.[4]  If

Strohmeier ever conducted business related to Oak Hill, it was at

the direction and under the control of James or Joan Noske.

Sometime in 1987 or 1988, John B. Ellering became president

of Armageddon and Parnell, and replaced Strohmeier as

---

[3] On June 14, 1985, the U.S. District Court for the District
of Minnesota entered a final judgment of permanent injunction as
to Foshaug, Inman, Armageddon, and Parnell, enjoining them under
secs. 7408 and 7402 from organizing or assisting in the
organization of an abusive tax shelter plan or arrangement
involving business trusts.

[4] Another case involving Noske trusts, Scherping v.
Commissioner, T.C. Memo. 1989-678, includes as a finding of fact
that in June 1983 James and Joan Noske took Strohmeier from an
alcoholic treatment center, made him a figurehead president of an
entity to which the taxpayers had transferred their dairy farm
assets, and placed him on the taxpayers' family farm to live and
work for the last half of 1983, doing farm chores at the
taxpayers' direction.

manager of Oak Hill. Ellering owned a bowling alley; he knew nothing about dairy farming.[5]

Petitioners had no official titles or offices in Oak Hill, Armageddon, or Parnell. Initially, petitioners received all 100 trust shares in Oak Hill and Pleasant Acres. On December 21, 1983, petitioners surrendered their original 100 shares in Oak Hill, each receiving 20 new shares. The remaining 60 shares purportedly were transferred to BBCA, Inc. (BBCA), an organization purporting to be a church.[6] The president of BBCA was Joan Noske.

During the years at issue, petitioners' day-to-day farming operation, including the parts business, was run by petitioners and their sons Gerard and Ryan, who received no wages for their labors. All the gross receipts from petitioners' farming

---

[5] In September 1995, Ellering was convicted by a jury in the U.S. District Court for the District of Minnesota of conspiracy to defraud the United States by impeding the Internal Revenue Service. His conviction was based on his participation with James and Joan Noske and Imelda Spaeth in a scheme to assist clients of the Noskes, who sought to reduce or avoid Federal income taxes, form business trusts that named Armageddon and Parnell as trustees.

After Ellering's criminal conviction, petitioners' son Gerard became president of Armageddon and Parnell.

[6] The minutes of a special meeting of the Oak Hill trustees, dated Dec. 21, 1983, and signed by Inman and Foshaug, recite that these transfers were made upon application of the petitioners and were unanimously approved by the trustees.

operation, including the parts business, were sent to Joan Noske at a post office box in Cold Springs, Minnesota. Some of these amounts were received at this post office box directly from the payors. In other instances, payors sent checks directly to petitioners, who would forward them to the Cold Springs post office box. When petitioners received bills from companies they bought parts from, these too were generally forwarded to the Cold Springs post office box.

Joan Noske generally made provision out of "Oak Hill" funds for paying farm expenses, parts inventory purchases, utility and other billings, and real estate taxes, as well as for paying certain of petitioners' living expenses, including expenses for insurance, reroofing petitioners' personal residence, hospital bills, a newspaper subscription, and property taxes on petitioners' residence. Oak Hill also paid 40 percent of petitioners' utilities.

During the years at issue, Joan Noske did all the bookkeeping for Oak Hill. She prepared the Federal income tax returns for Oak Hill and at least 20 other trusts that name Armageddon and Parnell as trustees. She also prepared petitioners' income tax returns for the years in issue. On a monthly or bimonthly basis, petitioners received ledgers from Joan Noske which accounted for funds purportedly received and disbursed by Oak Hill during the years at issue. The

disbursements included $125 per month to Joan Noske for her bookkeeping services.

On November 16, 1985, the U.S. District Court for the District of Minnesota entered a Final Judgment of Permanent Injunction as to James and Joan Noske, finding that they had engaged in conduct subject to penalty under section 6700 and enjoining them from organizing, assisting, selling, or otherwise promoting business trusts as abusive tax shelters. As part of the judgment, the Noskes were ordered to supply respondent's District Director with the names and addresses of all purchasers of the 186 business trusts on file with the Minnesota Secretary of State which list Armageddon and Parnell as corporate trustees. Subsequently, the Noskes identified Oak Hill and Pleasant Acres as being among the business trusts involved in the injunction action.

In September 1995, Joan and James Noske were convicted of, among other things, conspiracy to defraud the United States by impeding the Internal Revenue Service, and conspiracy to evade Federal income taxes. The convictions were based on the Noskes' participation in a scheme to assist their clients in reducing or avoiding Federal income taxes by forming business trusts which named Armageddon and Parnell as trustees. It was further determined that the Noskes participated in a scheme whereby their clients would transfer all of their income-producing property to

the business trusts and then issue 60 percent of their trust shares to BBCA, thus effectively evading the assessment and payment of 60 percent of their clients' Federal income tax liability.

Oak Hill filed Federal income tax returns for 1987 through 1989 reporting Schedule F income from petitioners' farming operation, interest income, Schedule C income from petitioners' parts business, and capital gains. In taxable year 1987, Oak Hill reported a net loss. In taxable years 1988 and 1989, Oak Hill reported that 40 percent of its net income was distributed to petitioners.[7] The trust itself paid no taxes. Petitioners reported only their distributive share of Oak Hill's net income on their joint Federal income tax returns.

Respondent determined that petitioners are taxable on the gross income reported by Oak Hill because the creation of Oak Hill and the subsequent transfer of petitioners' assets thereto was a sham transaction lacking in economic substance, because petitioners have improperly attempted to assign their income to

---

[7] For taxable year 1988, Oak Hill claimed an income distribution deduction for 100 percent of its reported distributable net income, reporting that 40 percent was distributed to petitioners, but failing to report the recipient of the remaining 60 percent. For taxable year 1989, Oak Hill reported that its reported distributable net income was distributed 40 percent to petitioners and 60 percent to BBCA.

Oak Hill, and because petitioners are taxable on the trust income
under the grantor trust rules in sections 671 through 678.

OPINION

If the creation of a trust has no real economic effect and
alters no cognizable economic relationships, it will be
disregarded for Federal income tax purposes; our guidepost is the
economic substance of the transaction.  See Zmuda v.
Commissioner, 79 T.C. 714, 719 (1982), affd. 731 F.2d 1417 (9th
Cir. 1984); Markosian v. Commissioner, 73 T.C. 1235, 1241 (1980).
This rule applies even if the trust is recognized pursuant to
State law as a business trust or other form of jural entity.  See
Zmuda v. Commissioner, supra.[8]

Whether a trust lacks economic substance is a question of
fact.  See Paulson v. Commissioner, 992 F.2d 789, 790 (8th Cir.
1993), affg. per curiam T.C. Memo. 1991-508.  Relevant factors
include whether the taxpayer's relationship as grantor to the
property differed materially before and after the trust's

---

[8] This is not the first occasion we have had to examine
trust arrangements devised and promoted by the Noskes.  On each
occasion, we determined that they were sham entities used by
taxpayers to avoid income tax.  See, e.g., Scherping v.
Commissioner, T.C. Memo. 1998-288; Paulson v. Commissioner, T.C.
Memo. 1991-643, affd. without published opinion 994 F.2d 843 (8th
Cir. 1993); Paulson v. Commissioner, T.C. Memo. 1991-508, affd.
992 F.2d 789 (8th Cir. 1993); Scherping v. Commissioner, T.C.
Memo. 1991-384; Chase v. Commissioner, T.C. Memo. 1990-615; Chase
v. Commissioner, T.C. Memo. 1990-164, affd. 926 F.2d 737 (8th
Cir. 1991); Scherping v. Commissioner, T.C. Memo. 1989-678.

formation, whether the trust had an independent trustee, whether an economic interest passed to other beneficiaries of the trust, and whether the taxpayer felt bound by any restrictions imposed by the trust or by the law of trusts. See Markosian v. Commissioner, supra at 1243-1245; Muhich v. Commissioner, T.C. Memo. 1999-192. The burden of proof is on petitioners. See Rule 142.

The evidence clearly establishes that Oak Hill lacked economic substance and was merely a paper entity created for the primary purpose of reducing petitioners' Federal income tax. Petitioners' relationship to their property did not differ materially before and after the creation of Oak Hill. Although petitioners purported to transfer all their income-producing personal property to Oak Hill, in reality they retained dominion and control over it. They continued to operate the farm and parts businesses just as they always had, making all the management decisions. Together with their sons Gerard and Ryan, petitioners provided all the income-producing labor and made all the management decisions. Petitioner wife testified that, except for bookkeeping, "Everything is run the same" on their farm as it was before the creation of Oak Hill. Petitioner wife testified

further that she did not really view the trust as being separate from herself.[9]

The record does not establish that Parnell and Armageddon were independent trustees or that they performed any significant duties or exercised any significant control or power over the farm or parts businesses. Contrary to the terms of Article IV, Section 3, of the Declaration of Trust, Parnell and Armageddon did not have "absolute and exclusive power and control over the management and conduct of the business". Petitioners concede that Inman and Foshaug were strangers to Oak Hill and were nothing more than figurehead presidents of the corporate trustees, merely signing documents, often blank or incomplete, at the instigation of the Noskes. The use of strangers as signers of organizational documents and the absence of any meaningful role by nominal trustees in the operation of the trust are evidence that the purported trust lacks economic substance. See Para Techs. Trust v. Commissioner, T.C. Memo. 1994-366, affd. without published opinion sub nom. Anderson v. Commissioner, 106 F.3d 406 (9th Cir. 1997), and cases cited therein.

---

[9] Petitioners argue that petitioner husband curtailed his involvement in the farm and parts businesses after 1985 because of health problems. Any such curtailment of petitioner husband's activities, however, cannot credibly be attributed to the existence of Oak Hill, allegedly created 2 years previously. In any event, petitioner husband continued to serve a managerial and supervisory role in the farm's operation even after 1985.

Petitioners also concede that Strohmeier served no meaningful function as "manager" of Oak Hill. Similarly, there is no evidence that Strohmeier's successor, Ellering, served any meaningful function as manager of Oak Hill. In fact, there is no evidence that Oak Hill ever conducted any business at all.[10]

Upon the alleged creation of Oak Hill, no economic interest passed to any beneficiary other than petitioners. Nor does the record establish that the subsequent purported transfer to BBCA of 60 percent of petitioners' shares in Oak Hill was a valid conveyance of petitioners' economic interests. To the contrary, at trial petitioners vigorously asserted that they never knowingly authorized any such transfer of their shares to BBCA.

Petitioners assert that they had motives apart from tax-avoidance for establishing Oak Hill, but any such motives are not credibly established on this record. For example, petitioners argue that Oak Hill was created for estate-planning purposes "to

[10] On brief, petitioners seek to attribute to Parnell and Armageddon the activities of the Noskes, arguing that Parnell and Armageddon controlled Oak Hill's "checkbook" through the agency of the Noskes. Petitioners have not established, however, that the Noskes were in fact the agents of Parnell or Armageddon. There is no mention of the Noskes in the Declaration of Trust. There is no evidence that the Noskes were authorized to or actually did assume the fiduciary duties allegedly imposed on the corporate trustees under the purported trust documents. Rather, the totality of the evidence strongly suggests that the Noskes provided petitioners with bookkeeping services, for which they were compensated, and bad advice as part of a conspiracy to defraud the United States, for which they were imprisoned.

keep the farm together in the family." It is unclear, however, how the establishment of Oak Hill would accomplish any such objective. Under Article III, Section 8 of the Declaration of Trust, if any trust certificate holder dies before termination of the trust, his shares become "null and void and shall immediately revert to the Board of Trustees, who shall thereupon name a replacement beneficiary or beneficiaries". Accordingly, the creation of Oak Hill would have provided petitioners no assurance that the farm would remain in their family. To the contrary, under the terms of the Declaration of Trust, absolute power over the disposition of the farm property, either during their lives or upon the death of either petitioner, would have resided with Parnell and Armageddon. In any event, the expectancy of an estate-planning advantage does not establish entitlement to an income tax advantage. See Prindle Intl. Marketing, UBO v. Commissioner, T.C. Memo. 1998-164.

Similarly, petitioners argue that the establishment of Oak Hill was motivated by a desire to achieve limited liability with respect to the parts business, in order to protect the farm property. We conclude, however, that any such objective was peripheral to petitioners' primary objective of deflecting their taxable income. Petitioners' personal farm property was commingled with the parts business property in Oak Hill, and so was not insulated from liability arising from the parts business.

Contending that they received only a share of the Oak Hill income, petitioners argue that they should be taxed only on the share they actually received.[11]  It is axiomatic, however, that taxation is concerned with "actual command over the property taxed--the actual benefit for which the tax is paid" and that the transfer of formal legal title will not operate to "shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred."  Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); see Sundance Ranches, Inc. v. Commissioner, T.C. Memo. 1988-535, affd. without published opinion (9th Cir. 1990). Petitioners clearly retained sufficient power and control over their farm and parts businesses to be properly treated as the recipients of the income for tax purposes.  Cf. Commissioner v. Sunnen, 333 U.S. 591, 604 (1948); Hutcherson v. Commissioner, T.C. Memo. 1984-165.

In light of our holdings on these issues, we need not reach respondent's alternative argument that petitioners should be taxed on the Oak Hill income under the grantor trust rules.

---

[11] The record does not establish what ultimately happened to the 60 percent of Oak Hill income allegedly distributed to BBCA. Cf. United States v. Klaphake, 64 F.3d 435 (8th Cir. 1995) (in a case involving the transfer of a family farm business to a Noske trust of which BBCA was a beneficiary, the taxpayers received cash back from BBCA on a regular basis).

Additions to Tax and Penalties

Respondent determined that petitioners are liable for additions to tax under section 6653(a) for taxable years 1987 and 1988, and an accuracy-related penalty under section 6662 for taxable year 1989. Section 6653(a)(1)(A) imposes an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is attributable to negligence. Section 6653(a)(1)(B) imposes an addition to tax equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence. Section 6662(a) imposes a 20-percent penalty on any portion of an underpayment that is attributable to negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the same circumstances. See Neely v. Commissioner, 85 T.C. 934 (1985). Petitioners have the burden of proving that respondent's determinations are incorrect. See Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

Petitioners argue only that because there is no underpayment of tax, there is no amount upon which to compute additions to tax or penalties. We have sustained respondent's determination that petitioners understated their Federal income tax liability for taxable years 1987, 1988, and 1989. Accordingly, petitioners' argument must fail.

Petitioners have not established that they used reasonable care in ascertaining their income tax liability for these years. They have not shown that they reasonably relied on a competent professional adviser independent of those persons who were involved in marketing these abusive trusts.  We sustain respondent's determinations on this issue.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.