T.C. Memo. 2004-256

UNITED STATES TAX COURT

GREG WILLIAM GOUVEIA, a.k.a. GREG W. GOUVEIA, a.k.a. GREG GOUVEIA
AND CAROL ANN GOUVEIA, a.k.a. CAROL GOUVEIA, ET AL.,[1] Petitioners
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 288-03, 562-03,    Filed November 9, 2004.
563-03, 564-03.

<u>Joe Alfred Izen, Jr.</u>, for petitioners.

<u>Michael E. Melone</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  In separate notices of deficiency,

respondent determined the following income tax deficiencies and

_____

[1]Cases of the following petitioners are consolidated
herewith:  Greg Gouveia and Carol Gouveia, docket No. 562-03;
Pago Trust, Phillip Norton, Trustee, docket No. 563-03; and
McKenzie Trust, Charles Boatright, Trustee, docket No. 564-03.

penalties with respect to petitioners' Federal income taxes:[2]

Greg William Gouveia, a.k.a. Greg W. Gouveia, a.k.a. Greg Gouveia and Carol Ann Gouveia, a.k.a. Carol Gouveia, docket No. 288-03

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|----------------------------------------|
| 1995 | $30,521   | $6,104 |
| 1996 | 22,947    | 4,589 |

Greg Gouveia and Carol Gouveia, docket No. 562-03

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|----------------------------------------|
| 1997 | $20,620   | $4,124 |
| 1998 | 21,982    | 4,396 |

Pago Trust, Phillip Norton, Trustee, docket No. 563-03

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|----------------------------------------|
| 1998 | $39,331   | $7,866 |

McKenzie Trust, Charles Boatright, Trustee, docket No. 564-03

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|----------------------------------------|
| 1998 | $1,136    | $227 |

Petitioners filed separate petitions to redetermine the deficiencies and related penalties.  We consolidated these cases (hereinafter this case) for trial, briefing, and opinion pursuant to Rule 141(a) because they present common issues of fact and law.

---

[2]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Monetary amounts are rounded to the nearest dollar.

The issues for decision are:[3]

(1) Whether the petitions filed in the names of the Pago and/or McKenzie Trusts should be dismissed for lack of jurisdiction;

(2) whether the Pago and/or McKenzie Trusts should be disregarded for Federal income tax purposes;

(3) even if the Pago and/or McKenzie Trusts are not disregarded for Federal income tax purposes, whether the net income of the rental real estate business, allegedly owned by the Pago Trust, and the automobile restoration business, allegedly owned by the McKenzie Trust, must be reported by Greg Gouveia (petitioner) and Carol Gouveia (collectively referred to as the Gouveias) on their Federal income tax returns for the years at issue;

(4) whether the notice of deficiency for the Gouveias' 1995 and 1996 taxable years was timely;

(5) if the Pago and McKenzie Trusts are respected for Federal income tax purposes, whether either trust is entitled to deductions for income distributions, management fees, or fiduciary fees; and

---

[3]The only other issues raised in the notices of deficiency and petitions are computational.

(6) whether petitioners are liable for the accuracy-related penalty for negligence or disregard of rules or regulations pursuant to section 6662(a) for each of the years at issue.

FINDINGS OF FACT

I.   Background

Some of the facts have been stipulated.  We incorporate the stipulated facts into our findings by this reference.  When the petitions in these cases were filed, the Gouveias[4] resided in Pismo Beach, California.  Although the Pago and the McKenzie Trusts' petitions alleged that the trusts maintained their principal places of business in California, the parties did not stipulate or otherwise introduce any evidence regarding the addresses of the trustees of the trusts as of the date the petitions were filed.

A.   The Gouveias' Automobile Restoration Business

In 1976, petitioner started an automobile restoration business in his father's garage.  Petitioner had previously studied welding, auto body, and machine tool theory at a junior college.  In 1977, his cousin became a partner in the business, but in 1978, petitioner purchased his cousin's interest and continued the business under the name of "Brassworks".  In the

[4]Only Mr. Gouveia appeared and testified at trial.  However, counsel for petitioners represented that Mrs. Gouveia, who is also a petitioner, was aware of these proceedings, had authorized Mr. Gouveia and his counsel to represent her interests, and has agreed to be bound by the results of this litigation.

course of Brassworks's business, petitioner fabricated brass radiator reproductions for Model T Fords and shipped them worldwide to customers who restored those automobiles, and petitioner also restored Model T Fords for resale at auctions. From 1976 through 1993, petitioner worked full time for Brassworks, and the Gouveias were the sole proprietors of the business from 1984 until 1993.

In March 1993, the Gouveias sold Brassworks for $661,725 to Inga, Inc., a corporation established by William and Debra Ingalls to purchase the business. Inga, Inc. paid the Gouveias part of the purchase price as a downpayment and executed two promissory notes and an installment note for the remaining amount. The principal amounts of the promissory notes were $35,000 and $16,240, which were payable, with interest, on their respective maturity dates of March 8, 1995, and March 8, 1999. The principal amount of the installment note was $363,877.30, which was payable to the Gouveias, with interest, in monthly installments of $4,100 beginning on June 8, 1993. As part of the sale of Brassworks, petitioner agreed that he would no longer manufacture any brass radiators or water pumps.

B.    The Gouveias' Real Estate Investments

In October 1987, the Gouveias purchased a half acre of unimproved land located at 285 and 289 Prado Road, San Luis

Obispo, California (Prado Road property).[5]  The Prado Road

property was zoned for light industrial construction, and

petitioner subsequently developed that property into five

commercial service units.  Each unit consisted of commercial

office space and had metal rollup doors, which contained areas

for light industrial work.  Petitioner moved Brassworks to this

location and leased the remaining units to other tenants.  After

developing the Prado Road property, petitioner managed and

maintained the property by hiring contractors, locating tenants,

entering into lease agreements with tenants, collecting rent

payments, and paying property taxes.  In 1993 and 1994, the

Gouveias earned $41,400 and $57,560 respectively, in gross rental

receipts from the Prado Road property.

## II.  Pago Trust

### A.  Formation

In approximately 1992 or 1993, petitioner explored the

possibility of creating trusts and sought advice from a company

called Independent Trust Consultants.[6]  Petitioner also spoke

with his tax return preparer, John Gragg, about forming trusts,

---

[5]In approximately 1981 or 1982, the Gouveias made their
first real estate investment, but they later sold the property
for a loss.  Around 1990, the Gouveias invested in another parcel
of real estate, which they leased with an option to buy and
eventually sold for a small profit.

[6]The record is silent as to the advice the company provided
or its role, if any, in assisting petitioner with forming the
trusts at issue.

but Mr. Gragg was not experienced in that area.  In addition, petitioner conducted his own independent research on the topic of trusts.

After deciding to form the trusts, petitioner asked Phillip Norton[7] to serve as trustee of the Pago Trust.  Mr. Norton had met petitioner in 1986 when they were neighbors in the same office park, and Mr. Norton later rented office space from petitioner in 1989 or 1990.  Mr. Norton was involved in the communications business; he had no experience managing a trust or developing real property.  Petitioner then approached Jeffrey Jeter and asked for his help in creating a trust.  Mr. Jeter had been a business acquaintance of petitioner since approximately 1989 and had performed some tool and die work for Brassworks. Mr. Jeter had no prior experience with trusts.  Mr. Jeter and Mr. Norton did not know each other personally but were introduced by petitioner during discussions about forming the trust.

On May 1, 1993, Mr. Jeter and Mr. Norton executed a contract entitled "Pago Trust, A Contractual Fiduciary Trust".  The contract contained a declaration of trust and a trust indenture which together set forth the terms governing the administration of the trust.

---

[7]Phillip Norton's name erroneously appears as "Norton Phillip" on the notice of deficiency issued to the Pago Trust, on the petition filed in the name of the Pago Trust, and on all subsequent filings.

The declaration of trust identified Mr. Jeter[8] as the
trust's creator and Mr. Norton as the trustee and described the
Pago Trust as a "Common Law contractual business trust
organization" governed by the common law of England.[9]  The
declaration of trust further provided that the company formed
under the trust shall be domiciled in California and "shall not
operate as a partnership, association, joint venture, joint stock
company, corporation or statutory trust."  The trust indenture
described the purpose of the Pago Trust as "fraternal, social,
economic and remunerative" and stated that "the Trustee(s) shall
have freedom to conduct capitalistic enterprises dealing in
properties, patents, copyrights, trademarks, formulae and
equities, and the acquisition of deeds and deeds of trust in the
aforesaid county."

The trust indenture granted sole dominion and control over
the administration of the trust to the trustee and expressly
prohibited the creator and any beneficiaries from having any
voice in the trust's administration.  The trustee had the
discretion to determine what amounts constituted capital or
income and was required to distribute all capital gain and
income.  The trustee could resign only by tendering a written,

---

[8]Mr. Jeter was not compensated for creating the Pago Trust.

[9]By use of the terms "trust", "trustee", "beneficiary", and
other related terms, we intend no implication as to the validity
of the trusts involved in these cases.

dated, and notarized document to the beneficiaries and board of trustees.

The declaration of trust directed the trustee to create 100 capital units of beneficial interest, in the form of certificates, and to issue them to the beneficiaries in exchange for property contributed to the "corpus of the company".  The beneficial interest certificates entitled the holder to share in distributions but conveyed no interest in the trust corpus and conferred no rights to participate in the management, control, or administration of the trust.  The certificates were freely transferable and were presumed to be owned by the person who possessed them.  The owner was entitled to his share of any distributions by presenting the certificate to the board of trustees and demonstrating his lawful possession of it.

On May 1, 1993, the Gouveias acquired 10 capital units of the Pago Trust in exchange for $100 and their agreement to assign the installment and promissory notes from the sale of Brassworks to the Pago Trust.  A certificate for 10 units in the Pago Trust was issued in the Gouveias' names and was signed by Mr. Norton.

On May 1, 1993, the Brookes Group acquired 90 capital units of the Pago Trust in exchange for $100 and its pledge to pay the Pago Trust, as capital, an amount not to exceed $600,000 but not less than $300,000.  A certificate for 90 units in the Pago Trust was issued in the Brookes Group's name and was signed by Mr.

Norton. The Brookes Group purports to be a private trust of the Turks and Caicos Islands, British West Indies, and the Century Trust Company, Ltd. purports to be the Brookes Group's trustee.[10]

In 1994 or early 1995, the Gouveias assigned the installment and promissory notes from the sale of Brassworks to the Pago Trust.[11]

B.   Operation of the Pago Trust

1.   Prado Road Property

On March 16, 1995, the Gouveias transferred the Prado Road property to the Pago Trust and, in exchange, received an installment note. The Pago Trust agreed to pay the Gouveias $1,500 monthly, beginning on January 15, 2017, until the principal amount of $303,182.59, with interest, was paid in full.

---

[10]The record provides no additional information about the Brookes Group or the Century Trust Company, Ltd.

[11]There is conflicting evidence on record as to the date of this transaction. The parties stipulated that the Gouveias assigned the notes to the Pago Trust on Mar. 17, 1995, and attached to the copies of the installment note and one of the promissory notes on record are signed statements by the Gouveias dated Mar. 17, 1995, which purport to assign the notes to the Pago Trust. However, the record indicates that on July 7, 1994, the Gouveias filed financing statements pursuant to the California Uniform Commercial Code that assigned their rights as secured parties of the installment note and one of the promissory notes to the Pago Trust. In 1994, the Pago Trust reported income from the installment note on its Form 1041, U.S. Income Tax Return for Estates and Trusts, which indicates it began receiving payments before 1995. Also, the Trustee Chronicle states that the notes were assigned on July 1, 1994.

As part of the transfer, the Gouveias' existing loan on the Prado Road property was repaid, allegedly by the Pago Trust.[12]

On March 15, 1995, the Pago Trust entered into a Property Management Agreement (property agreement) with California Property Services (CPS) that went into effect on April 1, 1995, and continued until March 31, 1999.  Under the terms of the property agreement, CPS agreed to act as agent for the Pago Trust and to perform the following duties with regard to the Prado Road property:  Advertise the availability of the property for rent, initiate and sign lease agreements, collect rent payments, evict tenants, make and/or supervise repairs, hire and supervise contractors to maintain the property, pay expenses and costs related to the property, deposit all receipts collected into a trust account for the Pago Trust, and remit funds monthly to the Pago Trust.[13]

On April 4, 1995, the Gouveias also agreed to act as the Pago Trust's agent and to provide management services for the Prado Road property.  The trust paid the Gouveias management fees for their services.  The relevant terms of the Property Management and Maintenance Agreement (maintenance agreement)

---

[12]The record does not indicate how the Pago Trust obtained the funds to satisfy the Gouveias' debt on the Prado Road property.

[13]The trust's records show that the Pago Trust never made any payments to California Property Services for its services under the contract.

between the Gouveias and the Pago Trust are, with only minor exceptions, identical to those contained in the property agreement between CPS and the Pago Trust, and the formats of the two agreements closely resemble each other.

After the Gouveias transferred the Prado Road property to the Pago Trust and through 1998, petitioner supervised repairs and improvements made by tenants and contractors to the inside and outside of the buildings, oversaw maintenance and landscaping work, responded to tenant complaints, signed new lease agreements, and paid all of the expenses related to the property from the Pago Trust's bank account.  Petitioner did not perform his management duties full time but tended to the Pago Trust's business "after hours".

To facilitate petitioner's payment of expenses attributable to the Prado Road property and, later, the Cross Street property, which we discuss below, petitioner and Mr. Norton met approximately three to four times each year.  During these meetings Mr. Norton signed checks drawn on the Pago Trust's bank account.[14]  Petitioner had usually filled out in advance the checks that Mr. Norton signed, but Mr. Norton also regularly signed groups of blank checks for petitioner's use.  In addition,

---

[14]Mr. Norton's compensation for acting as trustee of the Pago Trust ranged from $250 to $500 per year.

Mr. Norton signed checks payable to petitioner for his management fees, which petitioner had already filled out.

### 2.  Cross Street Property

On February 9, 1998, the Pago Trust purchased unimproved land located at 102 Cross Street, San Luis Obispo, California (Cross Street property), for $205,000.  Petitioner arranged for the Pago Trust to borrow $50,000 from Mrs. Gouveia's father, Edward Kazmierski, $50,000 from Maddalena Real Estate, and $105,000 from a "foreign lender" in order to acquire the Cross Street property.[15]  Petitioner did not consult with Mr. Norton before the purchase of the Cross Street property or during its later development.

On May 12, 1998, the Gouveias entered into a Construction Project Manager Agreement (manager agreement) in which they agreed to act as the Pago Trust's agent and to manage and coordinate the construction of a commercial building on the Cross Street property.  The trust paid the Gouveias management fees for their services.  Throughout 1998 and 1999, petitioner hired contractors and located suppliers of raw materials in connection with the development of the Cross Street property.[16]  Eventually,

---

[15]The record contains no documentary evidence identifying the person or entity that provided the $105,000 to the Pago Trust.

[16]According to the trust's internal management records, the Pago Trust financed the construction on the Cross Street property
(continued...)

commercial service units, similar to those petitioner had built on the Prado Road property, were constructed and leased to tenants. Petitioner continued to manage the Cross Street property after its development by overseeing repairs, supervising maintenance and landscaping, responding to tenant complaints, and initiating lease agreements.

### 3. Trust Income and Distributions

The Pago Trust filed Forms 1041, U.S. Income Tax Return for Estates and Trusts, for the taxable years 1994 through 1998.[17] Mr. Norton signed all of the Pago Trust's tax returns but did not review them for accuracy or compare the information reported on the returns to the Pago Trust's accounting records.

In 1994, the Pago Trust's only source of income was Inga Inc.'s payments on the installment note.[18] For the taxable years 1995 through 1998, the Pago Trust derived its income solely from payments on the installment note and from rental fees paid for the units on the Prado Road property. The Pago Trust's real

---

[16](...continued)
by borrowing against the Prado Road property and the Cross Street real estate.

[17]Mary L. Vincent prepared all of the tax returns filed for the Pago Trust, the McKenzie Trust, and the Gouveias beginning with the 1994 taxable year. Although petitioner did not know what her level of training was, he chose Ms. Vincent because she was familiar with trusts and Forms 1041.

[18]All of the payments received on the installment note were deposited into the Pago Trust's bank account.

estate rental business was profitable, and the trust declared distributions each year. From 1994 to 1998, the trust allegedly distributed more than $294,000 to the Brookes Group with respect to its purported ownership of 90 units of beneficial interest in the Pago Trust. Distributions to the Brookes Group were made via wire transfer to the Century Trust Company's overseas bank account. Because the Pago Trust distributed all of its income each year and claimed a corresponding income distribution deduction for those amounts, it never reported any taxable income or paid any taxes.

The Schedules K-1, Beneficiary's Share of Income, Deductions, Credits, etc., attached to the Pago Trust's Forms 1041, listed petitioner, Mrs. Gouveia, and the Brookes Group as the beneficiaries of the Pago Trust. According to the Schedules K-1, the Gouveias received the remaining 10 percent of the Pago Trust's distributions.

C.    Examination of the Pago Trust's 1998 Tax Return

On its Form 1041 for 1998, the Pago Trust reported income and expenses allocable to the Prado Road property on Schedule E, Supplemental Income and Loss. The trust claimed deductions for interest, taxes, fiduciary fees, trust manager fees, and income distributions.

On June 6, 2001, Mr. Norton executed a Form 56, Notice Concerning Fiduciary Relationship, and a Form 2848, Power of

Attorney and Declaration of Representative. On Form 2848, Mr. Norton designated attorney Joe Alfred Izen, Jr. to represent the Pago Trust before the Internal Revenue Service (IRS) for tax matters relating to the trust's 1997, 1998, and 1999 taxable years. Mr. Norton did not authorize Mr. Izen to perform any specific additional acts in the power of attorney and left the spaces on the Form 2848 for any such authorizations blank. The IRS agent assigned to these cases accepted the Forms 56 and 2848 and never determined that they were invalid.

On August 12, 2002, Mr. Norton agreed to extend the time for assessment of the Pago Trust's income tax for 1998 until December 31, 2003, by signing Form 872, Consent to Extend Time to Assess Tax.

On October 10, 2002, respondent issued a notice of deficiency to the Pago Trust for its 1998 taxable year in which respondent disallowed all of the Pago Trust's deductions for business expenses, taxes, depreciation, income distributions, management fees, and fiduciary fees. Accordingly, respondent increased the Pago Trust's taxable income by $102,010.

On January 13, 2003, a timely petition for redetermination challenging the notice of deficiency was filed in this Court on behalf of the Pago Trust. The caption of the petition contained

the name of the trust and its fiduciary,[19] and the petition was signed by Joe Alfred Izen, Jr., as attorney for the trust.

On July 9, 2003, Mr. Norton resigned as trustee by means of a written, notarized notice of resignation addressed to the beneficiaries and the board of trustees. On July 18, 2003, Mary L. Vincent, the "appointed fiduciary" for the Pago Trust, appointed Kathryn Elizabeth Adams as the new trustee.

On October 20, 2003, respondent filed a written motion to dismiss the petition filed by Pago Trust for lack of jurisdiction. On the same day, a hearing on the motion was held in San Francisco, California, and counsel for the parties presented oral argument. After concluding that the motion presented a factual issue that required the presentation of evidence at trial, we reserved ruling on the motion and stated that we would rule on the motion in this opinion.

III. McKenzie Trust

A. Formation

In 1993, petitioner asked William Hartmann to serve as creator of the McKenzie Trust and Charles Boatright to act as its trustee. Mr. Hartmann is Mrs. Gouveia's stepfather. Mr. Boatright and petitioner attended the same church and eventually became friends. Mr. Boatright had no prior experience operating a trust. Petitioner introduced Mr. Hartmann and Mr. Boatright to

---

[19]See supra note 7.

each other in the course of signing the documents to establish the McKenzie Trust.

On May 14, 1993, Mr. Hartmann and Mr. Boatright executed a contract entitled "McKenzie Trust, A Contractual Fiduciary Trust". The contract contained a declaration of trust and trust indenture, the terms of which were identical to the Pago Trust's formation documents. Although Mr. Boatright never issued certificates representing the 100 units of beneficial interest in the McKenzie Trust, the parties stipulated that Glenmere Investments was the 100-percent beneficiary of the trust during the taxable years 1995 through 1998.[20] Glenmere Investments and its fiduciary are located in Nevis, British West Indies.

B.  Operation of the McKenzie Trust

On May 14, 1993, the McKenzie Trust and petitioner executed a General Agreement in which petitioner agreed to manage the McKenzie Trust. The terms of the agreement were vague, requiring only that petitioner perform "duties as the manager of the McKenzie Trust and make sound business decisions which affect the function and operation of the said trust as a whole." The trust paid petitioner management fees for his services.

---

[20]The McKenzie Trust's tax returns for 1995 and 1997 have Schedules K-1 that list Glenmere Investments as a beneficiary, but there are no Schedules K-1 attached to the 1996 and 1998 returns.

Although the McKenzie Trust was ostensibly engaged in the business of restoring Model T Fords, it was petitioner who worked full time to order automotive parts from suppliers, to purchase rusted Model T Ford chassis, and to restore them into finished, operable, and safe Model T Ford speedsters for resale at auctions. Mr. Boatright signed checks from the trust's bank account in advance so that petitioner could fill them out when he purchased automobile parts. The McKenzie Trust had no employees other than petitioner, and all of the income earned by the McKenzie Trust was attributable to petitioner's labor. No agent of Glenmere Investments was ever involved with the automobile restoration business allegedly conducted by the McKenzie Trust.

Petitioner filed Forms 1041 for the taxable years 1995 through 1998 in the name of the McKenzie Trust, which were signed by Mr. Boatright. The 1995 and 1996 returns claimed income distribution deductions for amounts allegedly distributed to Glenmere Investments, and the trust did not pay any income taxes in 1995 or 1996. On the McKenzie Trust's 1996 return, petitioner's management fees were deducted on Schedule C, Profit or Loss From Business, as legal and professional services in computing the trust's income that was distributed. For the taxable year 1997, the management fees paid to petitioner exceeded the McKenzie Trust's income, and, as a result, the

McKenzie Trust did not make any distributions, report any taxable income, or pay any taxes.

C.    Examination of the McKenzie Trust's 1998 Tax Return

The McKenzie Trust reported business income from the automobile restoration business and claimed deductions for attorney, accountant, and return preparer fees and other deductions.  The deductions claimed by the McKenzie Trust exceeded its income, and the trust did not make any distributions or pay any taxes in 1998.

On June 5, 2001, Mr. Boatright signed Form 2848, in which he designated Mr. Izen to represent the McKenzie Trust before the IRS for tax matters relating to the trust's 1997, 1998, and 1999 taxable years, and Form 56.  Mr. Boatright did not authorize Mr. Izen to perform any specific additional acts in the power of attorney and left the spaces on the Form 2848 for any such authorizations blank.  The IRS agent accepted the Forms 56 and 2848 and never determined that they were invalid.

On October 10, 2002, respondent issued a notice of deficiency to the McKenzie Trust for its 1998 taxable year, in which respondent disallowed all of the McKenzie Trust's deductions for business expenses, management fees, and fiduciary fees.  Accordingly, respondent increased the trust's taxable income by $5,834.

On January 13, 2003, a timely petition for redetermination challenging the notice of deficiency was filed in this Court on behalf of the McKenzie Trust.  The caption of the petition contained the name of the trust and its fiduciary, and the petition was signed by Joe Alfred Izen, Jr., as attorney for the trust.

On October 20, 2003, respondent filed a written motion to dismiss the petition filed by the McKenzie Trust for lack of jurisdiction, which we address in the opinion that follows.

IV. The Gouveias' Income Tax Returns for 1995, 1996, 1997, and 1998

On their income tax returns for the years at issue, the Gouveias reported the following amounts:

| Year | Interest | Schedule C net profit/loss | Schedule E net inc./loss | Total gross income |
|------|----------|----------------------------|--------------------------|--------------------|
| 1995 | $3,724 | -0- | $3,224 | $38,458 |
| 1996 | 3,026 | $13,224 | 3,712 | 21,807 |
| 1997 | 1,568 | 25,026 | 3,261 | 31,725 |
| 1998 | 1,132 | 30,208 | 1,854 | 35,895 |

The following items of income from the Pago Trust and/or the McKenzie Trust were included in the above amounts:

| Year | Interest | Trust distribution | Management fees reported as Schedule C gross receipts |
|------|----------|--------------------|------------------------------------------------------|
| 1995 | $3,711 | $2,349 | -0- |
| 1996 | 3,026 | 3,712 | $24,589 |
| 1997 | 1,523 | 3,261 | 27,726 |
| 1998 | Unable to determine[1] | Unable to determine[1] | Unable to determine[1] |

[1]Schedules B, C, D, and E were not attached to the copy of the Gouveias' Form 1040, U.S. Individual Income Tax Return, for 1998 that is included in the record. The Gouveias reported $30,208 of Schedule C net profit on their 1998 Form 1040.

None of the Gouveias' tax returns for the years at issue identified the McKenzie Trust as the source of any income reported on the returns. It appears, however, that the management fees reported on Schedules C attached to some of the Gouveias' tax returns for the years at issue were those paid by the McKenzie and/or Pago Trusts.

On May 17, 2001, the Gouveias agreed to extend the time for assessment of their income tax for 1997 until June 30, 2002, by signing Form 872; on April 10, 2002, the Gouveias agreed to further extend that date until June 30, 2003, and signed another Form 872. On August 14, 2002, the Gouveias signed Form 872 for their 1998 taxable year, which extended the time for assessment until December 31, 2003.

On October 7, 2002, respondent issued a notice of deficiency for 1995 and 1996, which was issued more than 3, but less than 6, years after the 1995 and 1996 returns were filed. On October 10,

2002, respondent issued a separate notice of deficiency for 1997 and 1998.  In the notices of deficiency, respondent increased petitioner's Schedule C income and expenses by the amounts reported on the McKenzie Trust's tax returns, increased the Gouveias' Schedule E rental income and expenses by the amounts reported on the Pago Trust's tax returns,[21] and increased the Gouveias' capital gain and interest income by the Pago Trust's capital gain and interest income.

OPINION

I.  Motions To Dismiss for Lack of Jurisdiction

Rule 60(a)(1) provides that "A case shall be brought by and in the name of the person against whom the Commissioner determined the deficiency * * * and with the full descriptive name of the fiduciary entitled to institute a case on behalf of such person."  Rule 60(c) further provides that "The capacity of a fiduciary or other representative to litigate in the Court shall be determined in accordance with the law of the jurisdiction from which such person's authority is derived."  Under California law, a trustee is entitled to institute legal proceedings on behalf of a trust.  Cal. Prob. Code sec. 16249 (West Supp. 2004).

_____

[21]Respondent did not increase the Gouveias' Schedule E expenses for 1997 by the amount of management fees reported on the Pago Trust's 1997 tax return.

In the motions to dismiss the cases filed on behalf of the Pago and McKenzie Trusts, respondent alleges that both trusts have failed to show that: (1) Mr. Norton and Mr. Boatright were acting as trustees on January 13, 2003, when the petitions were filed; (2) Mr. Norton and Mr. Boatright have ever been represented by Mr. Izen in connection with the filing of the petitions; and (3) Mr. Norton and Mr. Boatright authorized Mr. Izen to file the petitions on behalf of the trusts. As a result, respondent argues, the petitions were not filed by the proper party, and we should dismiss the trusts' petitions for lack of jurisdiction.

Petitioners argue that by signing Forms 56 and 2848, Mr. Norton and Mr. Boatright identified themselves as participants in the trust arrangement and authorized Mr. Izen to represent the Pago and McKenzie Trusts. Petitioners further argue that because respondent never challenged the validity of Forms 56 and Forms 2848 during the audit, or at any other proceeding, respondent should be estopped from asserting that Mr. Izen lacked authority to file the petitions on behalf of the Pago and McKenzie Trusts.

Unless a petition is filed by the taxpayer or someone lawfully authorized to act on behalf of the taxpayer, we are without jurisdiction to consider the petition. See Fehrs v. Commissioner, 65 T.C. 346, 348 (1975). Petitioners have the burden of proving that this Court has jurisdiction by

establishing affirmatively all facts giving rise to our jurisdiction. See Patz Trust v. Commissioner, 69 T.C. 497, 503 (1977). After reviewing the record, we conclude that petitioners have failed to carry their burden of proof.

Although the trusts' petitions conformed to Rule 60(a)(1), and Mr. Norton and Mr. Boatright may have been the proper parties to petition this Court on behalf of the trusts,[22] neither Mr. Norton nor Mr. Boatright actually petitioned this Court on behalf of the trusts. Rather, Mr. Izen signed the petitions as counsel for the Pago and McKenzie Trusts. Petitioners have not shown that Mr. Norton or Mr. Boatright authorized or ratified the filing of the petitions on behalf of either trust.

Neither the Internal Revenue Code nor the Tax Court Rules of Practice and Procedure define the means by which a taxpayer authorizes an attorney to file a petition in this Court. See sec. 7452; Rule 24. Whether a taxpayer has properly granted an attorney the authority to petition the Tax Court is a factual issue governed by the common law principles of agency. Adams v. Commissioner, 85 T.C. 359, 369-372 (1985); Kraasch v. Commissioner, 70 T.C. 623, 626-629 (1978); Trans World Travel v. Commissioner, T.C. Memo. 2001-6; John Arnold Executrak Sys., Inc. v. Commissioner, T.C. Memo. 1990-6. In order to bind the principal, the agent must have either actual or apparent

---

[22]See infra note 23.

authority, or the principal must ratify the agent's acts.  <u>Trans World Travel v. Commissioner</u>, <u>supra</u>.  Authority may be granted by express statements or may be derived by implication from the principal's words or actions.  Restatement, Agency 2d, sec. 26 (1957).  Whether an agent is authorized to act for the principal is decided by taking into account all the circumstances, including the relationship of the parties, the common business practices, the nature of the subject matter, and the facts of which the agent has notice concerning objects the principal desires to accomplish.  <u>Id.</u> at sec. 34.  We must decide the extent of Mr. Izen's authority to act for the trusts on the basis of all the facts and circumstances revealed by the record.  <u>Adams v. Commissioner</u>, <u>supra</u> at 369-373; <u>Kraasch v. Commissioner</u>, <u>supra</u> at 626-629.

Mr. Norton only became aware of respondent's examination of the Pago Trust after a brief conversation with petitioner in 2001, and they never discussed the matter again.  Mr. Norton had never met with or spoken to Mr. Izen before the trial in this case.  Further, Mr. Norton testified that he did not recall authorizing the hiring of an attorney for the Pago Trust or authorizing an attorney to file a petition with this Court. Petitioners have not offered any evidence or elicited any testimony upon which we can conclude that Mr. Norton later ratified the filing of the petition, and it is unlikely that any

such evidence exists given Mr. Norton's limited knowledge of respondent's audit of the Pago Trust.[23]

In addition, petitioners did not present any testimony from Mr. Boatright to establish that he authorized Mr. Izen to file the petition for the McKenzie Trust, and they did not offer any evidence that he later ratified Mr. Izen's actions.  The failure to produce such evidence or available testimony leads us to conclude that Mr. Boatright did not authorize or ratify the filing of the petition for the McKenzie Trust.  Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Petitioners rely solely on the Forms 56 and 2848 signed by Mr. Norton and Mr. Boatright to establish our jurisdiction.  However, filing a Form 56 merely notifies respondent of a fiduciary relationship and entitles the fiduciary to receive communications regarding the tax matters specified therein.  No provision of Form 56 operated to create an agency relationship

---

[23]In addition, the record casts doubt on whether Mr. Norton was still acting as trustee for the Pago Trust on Jan. 13, 2003, when the petition was filed.  Mr. Norton apparently attempted to resign as trustee in April of 2001, but he did not tender his official resignation until July 9, 2003.  Although Mr. Norton's participation in the Pago Trust's operation was negligible throughout its existence, petitioners have not demonstrated that he performed any acts as trustee after June 6, 2001, the date he signed the Forms 56 and 2848, other than tendering his official resignation.

between Mr. Izen and either trust, or between Mr. Izen and the trustees.

By filing Form 2848, the taxpayer authorizes the representative to represent the taxpayer before the IRS and to perform any act that the taxpayer can perform, subject to certain exceptions not relevant here.  While the filing of Form 2848 is a factor we consider in deciding whether the petition was filed with the actual or apparent authority of the taxpayer, it is not determinative; we also consider all of the facts and circumstances in our analysis of the existence and scope of an agency relationship.  See John Arnold Executrak Sys., Inc. v. Commissioner, supra; Shopsin v. Commissioner, T.C. Memo. 1984-151, affd. without published opinion 751 F.2d 371 (2d Cir. 1984).

In Trans World Travel v. Commissioner, supra, John Arnold Executrak Sys., Inc. v. Commissioner, supra, and Shopsin v. Commissioner, supra, we held that the taxpayer's accountant or attorney had acted as the taxpayer's authorized agent in filing and signing the petition filed with this Court on facts showing that, in addition to executing Form 2848 and appointing the accountant or attorney as its representative, the taxpayer routinely delegated the handling of all tax matters to the agent; spoke regularly with the agent in regard to tax matters; relied on the agent for advice and deferred to the agent's judgment on a

continuing basis; and established a pattern of forwarding all tax communications from the Commissioner to the agent.

Other than petitioners' having filed Form 2848, none of the facts or circumstances mentioned in the cases discussed above are present herein.  In the absence of any credible evidence to establish that Mr. Izen and the trustees had a relationship from which we could infer that a sufficient grant of authority occurred or that they ever communicated with each other regarding the filing of petitions on behalf of the trusts, we find that petitioners have failed to prove that the trustees authorized Mr. Izen to petition this Court on behalf of the Pago and McKenzie Trusts.  Accordingly, we grant respondent's motion to dismiss the petitions filed by the Pago and McKenzie Trusts for lack of jurisdiction, on the ground that no proper persons have petitioned the Court.  As a result of our ruling, we do not consider or decide any issue raised in the petitions filed in the names of the Pago and McKenzie Trusts.

II.  Statute of Limitations[24]

Section 6501(a) provides that the amount of any tax imposed shall be assessed within 3 years after the return was filed. However, if the taxpayer omits from gross income an amount properly includable that is in excess of 25 percent of the gross income reported on the return, the tax may be assessed within 6 years from the date the return was filed.  Sec. 6501(e)(1)(A). Any amount that is omitted from gross income but is "disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item", shall not be taken into account for purposes of computing the amount of gross income omitted from the return. Sec. 6501(e)(1)(A)(ii).  In applying section 6501(e)(1)(A)(ii), we must consider whether an adjustment to the taxpayer's gross income might be apparent from the face of the return to the "reasonable man".  Univ. Country Club, Inc. v. Commissioner, 64 T.C. 460, 471 (1975).  Although section 6501(e)(1)(A)(ii) does not require that the return disclose the exact amount of the

_____

[24]As a preliminary matter, we note that the Gouveias did not raise the statute of limitations as a defense in their pleadings, as required by Rule 39.  However, we granted respondent leave to file an amendment to answer that addressed the statute of limitations issue.  Subsequently, both parties discussed the issue in their pretrial memoranda and on brief.  Under these circumstances, we consider the issue to have been tried by consent of the parties.  Rule 41(b)(1); LeFever v. Commissioner, 103 T.C. 525, 538 (1994), affd. 100 F.3d 778 (10th Cir. 1996); Anderson v. Commissioner, T.C. Memo. 1993-288, affd. without published opinion 36 F.3d 1091 (4th Cir. 1994).

omitted income, the return should provide respondent with a "'clue' to the existence of the error." Quick Trust v. Commissioner, 54 T.C. 1336, 1347 (1970), affd. 444 F.2d 90 (8th Cir. 1971). Respondent bears the burden of proving that the 6-year period for assessment applies. Bardwell v. Commissioner, 38 T.C. 84, 92 (1962), affd. 318 F.2d 786 (10th Cir. 1963).

The Gouveias assert that the Pago and McKenzie Trusts' Forms 1041 and attached Schedules K-1 must be considered along with the Gouveias' individual income tax returns. When read together, the Gouveias argue, their returns and the trusts' returns provided adequate disclosure of the nature and amount of the omitted items of income. Therefore, the Gouveias argue, assessment of deficiencies for 1995 and 1996 is barred by the 3-year statute of limitations.

Respondent argues that the 6-year period of limitations of section 6501(e) applies to the Gouveias' 1995 and 1996 taxable years because the amount of gross income the Gouveias failed to report from the Pago and McKenzie Trusts exceeded 25 percent of the amount of gross income stated on the Gouveias' returns. Respondent further argues that the Gouveias' tax returns did not adequately disclose the nature and amount of omitted income attributable to the McKenzie Trust and that the income from the McKenzie Trust alone exceeds 25 percent of the gross income the Gouveias reported.

We agree with respondent for the reasons that follow. The Gouveias reported gross income of $38,458 and $21,807 on their 1995 and 1996 returns, respectively. Twenty-five percent of these amounts is $9,615 and $5,452, respectively. The McKenzie Trust reported gross income of $14,148 and $11,986 in 1995 and 1996, respectively, which exceeds 25 percent of the gross income reported by the Gouveias for 1995 and 1996. Although the Gouveias' returns listed the Pago Trust as a source of income, the returns contained absolutely no reference to the McKenzie Trust. Where the individual return makes no reference to the trust as a source of income, we do not consider any documents in addition to the individual returns in determining whether the omitted income was adequately disclosed.[25] Connell Bus. Co. v. Commissioner, T.C. Memo. 2004-131; Reuter v. Commissioner, T.C. Memo. 1985-607. We conclude, therefore, that respondent was not apprised of the nature and amount of the omitted income attributable to the McKenzie Trust. Accordingly, we hold that the 6-year period of limitations in section 6501(e) applies to the Gouveias' 1995 and 1996 taxable years and that respondent's determination with respect to those years was timely.

---

[25]Even if we looked beyond the Gouveias' returns to the McKenzie Trust's 1995 and 1996 returns, including the attached Schedules K-1, they could not have adequately disclosed the omitted income because they contained absolutely no mention of the Gouveias.

III. <u>Burden of Proof</u>

The Gouveias argue that section 7491(a) shifts the burden of proof to respondent with respect to all other issues.  The Gouveias further contend that according to the Court of Appeals for the Ninth Circuit, respondent bears the burden of proof in unreported income cases.  Respondent contends that the Gouveias do not meet the requirements of section 7491(a) and further contends that respondent's determinations are entitled to the presumption of correctness.  Although our resolution of the issues in this case is based on the preponderance of the evidence rather than the allocation of the burden of proof, we address the parties' arguments in the discussion that follows.

In general, respondent's determinations in the notice of deficiency are presumed to be correct, and the taxpayer bears the burden of proving them wrong.  <u>Welch v. Helvering</u>, 290 U.S. 111 (1933).  Where the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining the tax liability of the taxpayer, the burden of proof shifts to the Secretary, but only if the taxpayer has complied with substantiation requirements, has maintained all required records, and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews. Sec. 7491(a).

In cases of unreported income, the Court of Appeals for the Ninth Circuit, to which an appeal in this case apparently would lie absent a stipulation to the contrary, requires that the Commissioner provide a minimal evidentiary foundation connecting the taxpayer to the unreported income before the presumption of correctness attaches to respondent's determination.  See Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985); Weimerskirch v. Commissioner, 596 F.2d 358, 360-361 (9th Cir. 1979), revg. 67 T.C. 672 (1977); Petzoldt v. Commissioner, 92 T.C. 661, 687-691 (1989); Residential Mgmt. Servs. Trust v. Commissioner, T.C. Memo. 2001-297; Johnston v. Commissioner, T.C. Memo. 2000-315. Once the Commissioner has met this initial burden of production, the taxpayer must establish by a preponderance of the evidence that the Commissioner's determination is arbitrary or erroneous. Rapp v. Commissioner, supra; Petzoldt v. Commissioner, supra; Residential Mgmt. Servs. Trust v. Commissioner, supra.  We defer to the Court of Appeals for the Ninth Circuit's evidentiary requirement under the doctrine set forth in Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).  However, we note that the Court of Appeals for the Ninth Circuit's rule does not automatically shift the burden of proof regarding the unreported income to respondent, as alleged by the Gouveias.

After reviewing the record, we find that respondent has introduced ample evidence connecting the Gouveias to the income-producing activities of the Pago and McKenzie Trusts. The record shows that petitioner managed and developed rental real estate properties owned by the Pago Trust and that petitioner worked full time in furtherance of the automobile restoration business allegedly conducted by the McKenzie Trust. Moreover, the Pago and McKenzie Trusts compensated petitioner for his management services, and the Gouveias received distributions from the Pago Trust. See Johnston v. Commissioner, supra. Accordingly, we hold that respondent's determination is entitled to the presumption of correctness.

We also hold that section 7491(a) does not shift the burden of proof to respondent. Petitioners failed to produce credible evidence that the Pago and McKenzie Trusts should be respected for Federal income tax purposes as required by section 7491(a)(2). Moreover, petitioners did not prove that they had complied with relevant substantiation requirements, that they had maintained all records required by the Internal Revenue Code, and that they had cooperated with reasonable requests for witnesses, information, documents, meetings, and interviews. Consequently, section 7491(a) does not shift the burden of proof on the factual issues raised in this case to respondent, and petitioners must

bear the burden of proof on all issues in this case, other than the statute of limitations issue under section 6501.[26]

## IV.  Whether the Pago and McKenzie Trusts Lack Economic Substance

Respondent argues that the Pago and McKenzie Trusts were sham entities with no economic substance and should be disregarded for Federal income tax purposes.  Alternatively, respondent argues that the income earned by the Pago and McKenzie Trusts should be taxed to the Gouveias under the assignment of income doctrine or the grantor trust rules of sections 674(a), 675(1), and 677(a).  Petitioners dispute each of respondent's arguments and contend that the "McKenzie Trust and Pago Trust engaged in extensive economic activity" and that the trusts cannot be characterized as shams because a valid business purpose for each trust existed.

Taxpayers have a legal right, by whatever means allowable under the law, to structure their transactions to minimize their tax obligations.  See Gregory v. Helvering, 293 U.S. 465, 469 (1935).  Transactions, however, that have no significant purpose other than to avoid tax and do not reflect economic reality will not be recognized for Federal income tax purposes.  See Zmuda v. Commissioner, 79 T.C. 714, 719 (1982), affd. 731 F.2d 1417 (9th Cir. 1984).  We have held that, if a transaction has not altered

---

[26]Although respondent has the initial burden of production with respect to the penalty imposed under sec. 6662, the burden of proof remains on petitioners.  Sec. 7491(c).

any cognizable economic relationships, we must look beyond the form of the transaction and apply the tax law according to the transaction's substance.  See Markosian v. Commissioner, 73 T.C. 1235, 1241 (1980).  This principle applies regardless of whether the transaction creates an entity with separate existence under State law.  Zmuda v. Commissioner, supra at 720.

In deciding whether a purported trust lacks economic substance, we consider the following factors:  (1) Whether the taxpayer's relationship, as grantor, to property purportedly transferred into trust differed materially before and after the trust's formation; (2) whether the trust had a bona fide independent trustee; (3) whether an economic interest in the trust passed to trust beneficiaries other than the grantor; and (4) whether the taxpayer honored restrictions imposed by the trust or by the law of trusts.  Markosian v. Commissioner, supra at 1243-1244; Norton v. Commissioner, T.C. Memo. 2002-137; Castro v. Commissioner, T.C. Memo. 2001-115; Buckmaster v. Commissioner, T.C. Memo. 1997-236; Hanson v. Commissioner, T.C. Memo. 1981-675, affd. per curiam 696 F.2d 1232 (9th Cir. 1983).

A.    The Gouveias' Relationship to the Trusts' Property

The first factor we consider in deciding whether a trust has economic substance is whether a taxpayer's relationship, as grantor, to the property transferred into trust differed materially before and after the trust's formation.  Markosian v.

Commissioner, supra at 1243.  In considering this factor, we look to the economic realities of the arrangement to ascertain the true grantor of the trust, regardless of who is named as grantor in the declaration of trust.  Zmuda v. Commissioner, supra at 720-721; Stern v. Commissioner, 77 T.C. 614, 647 (1981); Buckmaster v. Commissioner, supra.

### 1.  Pago Trust

Although Mr. Jeter was the nominal grantor, petitioner clearly initiated the establishment of the Pago Trust. Petitioner solicited Mr. Jeter's assistance in signing the trust documents, aware of the fact that Mr. Jeter had no prior experience with trusts, and chose Mr. Norton to serve as trustee. At petitioner's direction, Mr. Jeter appointed Mr. Norton to act as the trustee, having previously met Mr. Norton only once.  Mr. Jeter testified that he understood that once he signed the trust documents and appointed a trustee, he would play no role in the management or operation of the trust.  According to Mr. Jeter, he was "helping out a friend", and since he knew nothing about trusts, he simply followed petitioner's orders.  Further, Mr. Jeter knew nothing about the Pago Trust's business, except that the trust was "some form of a tax shelter".

In addition, only petitioner contributed property to the trust, and the installment note, promissory notes, and the Prado Road property were the only assets held by the Pago Trust until

1998. Therefore, we find that Mr. Jeter was merely a "straw man" used to form the Pago Trust and that petitioner was, in substance, its true grantor. See Zmuda v. Commissioner, supra at 720-721; Buckmaster v. Commissioner, supra.

Petitioner's relationship to the Prado Road property remained essentially unchanged, and petitioner conducted his real estate investment affairs in the same manner, both before and after the Pago Trust was formed. Before 1995, petitioner purchased the unimproved Prado Road property, managed all aspects of renting and maintaining the industrial facility he had developed on the property, and collected all of the profits attributable to the property. After 1995 when petitioner transferred the Prado Road property to the Pago Trust, petitioner continued to manage the property under the pretext of the maintenance agreement. Through his payment of the Pago Trust's monthly expenses using the trust's bank account, petitioner also maintained access to the income that the Pago Trust received from the installment note and could use those funds to further the real estate investments he made through the trust. Petitioner continued to deal in real estate by selecting the Cross Street property for the Pago Trust to purchase, arranging for financing, developing the property into another industrial facility, and managing it under a contract with the trust. Further, petitioner continued to receive a significant portion of the profits from

the Prado Road property in the form of management fees and distributions from the trust.

Comparing the situations before and after the creation of the Pago Trust, the only discernible differences in petitioner's relationship to the Prado Road property and to his real estate investment activities were that he used the Pago Trust's bank account to deposit income and pay expenses generated by the rental properties, and petitioner received profits from the rental property in the form of "management fees" and income distributions. Petitioner admitted at trial that the only difference between the managerial duties he performed as the owner of the Prado Road property and the duties he performed under the maintenance agreement was that he was responsible for getting the work done, he could not procrastinate, and he kept better business records. These differences hardly rise to the level of being material.

We find that the Gouveias' relationship to the trust property before and after its transfer to the Pago Trust was not materially different. See Norton v. Commissioner, supra; Lund v. Commissioner, T.C. Memo. 2000-334. This factor favors respondent.

        2.    McKenzie Trust

With respect to the McKenzie Trust, we likewise conclude that Mr. Hartmann was merely a straw man in forming the McKenzie

Trust and that petitioner was its true grantor.  Petitioner arranged for Mr. Hartmann to act as the trust's creator, and petitioner selected Mr. Boatright, a personal friend whom petitioner knew to be unfamiliar with trusts, to serve as trustee.  Mr. Hartmann appointed Mr. Boatright as trustee without having met him before signing the trust documents.  Further, the record is devoid of any evidence that anyone other than petitioner, who contributed his services and technical expertise in restoring automobiles, transferred any property or services to the McKenzie Trust.  Therefore, we find that petitioner was the true grantor of the McKenzie Trust.  See Zmuda v. Commissioner, 79 T.C. at 720-721; Buckmaster v. Commissioner, T.C. Memo. 1997-236.

Before forming the trust, petitioner had operated Brassworks as a sole proprietorship.  After selling Brassworks to the Ingallses, petitioner returned to the automobile restoration business and operated it under the name of "McKenzie Trust, Charles Boatright, Trustee".  Although petitioner no longer fabricated radiators, he continued to restore Model T Fords.  Further, petitioner continued to receive essentially all of the profits from the automobile restoration business in the form of management fees.  The only apparent difference in petitioner's conduct of the business after he formed the trust was that he

used the McKenzie Trust's bank account for all of his business transactions, and the profits he retained from the business were disguised as management fees.

We find that the Gouveias' use of the trust property before and after its transfer to the McKenzie Trust was not materially different.  See Castro v. Commissioner, T.C. Memo. 2001-115; Buckmaster v. Commissioner, supra.  This factor favors respondent.

B.    Independent Trustee

The second factor we consider is whether the trust had a bona fide independent trustee.  Markosian v. Commissioner, 73 T.C. at 1243-1244.  Whether the nominal trustee had any meaningful role in the operation of the trust or exercised any control over the trust is significant to our consideration of this factor.  See Zmuda v. Commissioner, supra at 720; Norton v. Commissioner, T.C. Memo. 2002-137; Lund v. Commissioner, supra.

1.    Pago Trust

The only act Mr. Norton performed as trustee of the Pago Trust was to sign various trust documents, such as the trust's declaration and indenture, the checks drawn on the trust's account, and the trust's income tax returns.  Mr. Norton understood that the trust served as a business organization formed to hold the real estate petitioner intended to develop and that paying the trust's bills would be the only duty required of

him.  Because Mr. Norton never possessed the Pago Trust's checkbook, on the few occasions he and petitioner met each year, Mr. Norton signed several blank checks at a time, as well as checks that petitioner had already filled out.

Mr. Norton's lack of participation in the Pago Trust is further demonstrated by his failure to review any of the trust's formation documents before signing them, his failure to review any of the Pago Trust's business records or the income tax returns he signed, and his failure to inquire into the reasonableness of the management fees the Pago Trust paid petitioner.  Moreover, Mr. Norton never participated in selecting the Cross Street property or in any decisions with regard to its development, and the record lacks any credible evidence that Mr. Norton controlled any significant trust decisions.

In contrast, petitioner exercised complete control over the trust's assets and made all decisions relating to the trust's daily business under the authority granted to him in the maintenance and manager agreements.  Moreover, petitioner maintained the unfettered discretion to determine the amount of his own management fees.

As a result, we find that no independent trustee had any meaningful role in operating the Pago Trust.  See Markosian v. Commissioner, supra at 1243; Zmuda v. Commissioner, supra at 720;

Norton v. Commissioner, supra; Lund v. Commissioner, T.C. Memo. 2000-334.  This factor favors respondent.

### 2.  McKenzie Trust

The evidence on record with respect to Mr. Boatright's influence and control over the McKenzie Trust is limited to the appearance of his signature on various trust documents, including the trust's declaration and indenture, the checks drawn on the trust's account, and the trust's income tax returns.  The record lacks any credible evidence that Mr. Boatright functioned as an independent trustee.  Mr. Boatright did not testify at trial, and we conclude, based on his failure to do so, that his testimony would have been unfavorable to petitioners.  Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. at 1165; Christal v. Commissioner, T.C. Memo. 1998-255.

It is apparent from the record that petitioner controlled the operation of the McKenzie Trust.  Pursuant to the General Agreement, the McKenzie Trust granted petitioner broad managerial powers over the trust, which he exercised by controlling the day-to-day operation of the automobile restoration business.  In fact, no one other than petitioner performed any work for the McKenzie Trust, and all of the income earned by the trust was attributable to his expertise.

Therefore, we find that no independent trustee had any meaningful role in operating the McKenzie Trust.  See Zmuda v.

<u>Commissioner</u>, 79 T.C. at 720; <u>Markosian v. Commissioner</u>, <u>supra</u> at 1243; <u>Norton v. Commissioner</u>, <u>supra</u>; <u>Lund v. Commissioner</u>, <u>supra</u>. This factor favors respondent.

C.    <u>Economic Interests</u>

The third factor we consider is whether a genuine economic interest in the trusts passed to anyone other than the Gouveias. <u>Markosian v. Commissioner</u>, <u>supra</u> at 1243.

1.    <u>Pago Trust</u>

Petitioners have not offered any admissible evidence that identifies the owners or beneficiaries of the Brookes Group or the ultimate recipient of the funds distributed to its foreign beneficiary.  At trial, counsel for respondent elicited testimony that shows petitioner possessed the original copy of the Brookes Group's certificate for 90 units of beneficial interest in the Pago Trust.  Further, the record is devoid of any credible evidence that the Brookes Group ever fulfilled its commitment to advance funds to the Pago Trust to purchase real estate.

It is inconceivable that petitioners would assign to the trust the steady stream of income from the installment note and receive only 10 percent of the trust's distributions in return.[27] It is also inconceivable that petitioners, in exchange for

---

[27]We are also unpersuaded by petitioner's testimony that he transferred his property to the Pago Trust because he needed only 10 percent of the trust's income to live on, and he thought that operating the business in trust form would guarantee him a lifetime of income distributions.

payments to begin in the year 2017, would transfer their profitable rental real estate into a trust that was required to pay 90 percent of its income to the Brookes Group. See Castro v. Commissioner, T.C. Memo. 2001-115; Buckmaster v. Commissioner, T.C. Memo. 1997-236. Petitioners have not introduced any evidence that the Brookes Group was anything more than an intermediary designed to move money offshore.

On these facts, we conclude that petitioners have failed to prove that any economic interest passed to any other beneficiaries. See Markosian v. Commissioner, 73 T.C. at 1244. This factor weighs against petitioners.

2. McKenzie Trust

Petitioners failed to produce any admissible evidence that identifies the owners or beneficiaries of Glenmere Investments, the purported 100-percent beneficiary of the McKenzie Trust, and petitioners have not offered any credible evidence that Glenmere Investments ever received any distributions from the trust. In fact, the certificate for 100 units of beneficial interest was never actually issued to Glenmere Investments. Further, in 1996, the trust paid more than half of its profits from the automobile restoration business to petitioner in management fees, and in 1997 and presumably in 1998, petitioner's management fees exceeded the trust's business profits, leaving no income to distribute.

On these facts, we conclude that petitioners have failed to prove that any economic interest passed to any other beneficiaries. See id.; Castro v. Commissioner, supra. This factor weighs against petitioners.

D.    Restrictions Imposed by the Trusts or the Law of Trusts

The fourth factor we consider is whether the Gouveias honored restrictions imposed by the trusts or by the law of trusts. Markosian v. Commissioner, supra at 1244.

1.    Pago Trust

The terms of the trust granted dominion and control over the administration of the trust to Mr. Norton. However, the broad authority granted to petitioner under the maintenance and manager agreements imposed few, if any, restrictions on petitioner's management of the Pago Trust. Petitioner, rather than Mr. Norton, made all decisions regarding the trust's assets without having consulted with or having sought approval from the trustee. Moreover, petitioner had the absolute discretion to withdraw management fees from the trust and was not restricted in any meaningful way by the trustee or the terms of the trust.

Accordingly, we find that petitioners were not bound by any restrictions imposed by the trust or the law of trusts. See id.; Norton v. Commissioner, T.C. Memo. 2002-137. This factor weighs against petitioners.

2.  McKenzie Trust

Under the broad authority granted to petitioner in the General Agreement, petitioner dealt freely with the trust's funds to purchase automotive parts and the Model T Ford chassis he restored.  The record does not indicate that petitioner ever consulted with Mr. Boatright before purchasing supplies for the business or selling the restored automobiles, even though the terms of the trust granted dominion and control over its administration to Mr. Boatright.  Further, while the terms of the trust mandated that the trust distribute 100 percent of its profits to Glenmere Investments, petitioner withdrew trust income in the form of management fees, without restriction, which left little, if anything, to be distributed to the nominal beneficiary of the trust.  Accordingly, we find that petitioners were not bound by any restrictions imposed by the trusts or the law of trusts.  Markosian v. Commissioner, supra at 1244; Norton v. Commissioner, supra.  This factor weighs against petitioners.

E.  Conclusion

After reviewing the record, we cannot conceive of any reason, other than tax avoidance, for the Gouveias to have transferred a substantial portion of their personal income and property and to have provided their full-time labor to the Pago and McKenzie Trusts.  Our conclusion is supported by the inherent

implausibility of the trust arrangement and petitioners' failure to provide any legitimate reason for creating the trusts.

At trial, petitioner asserted that he chose the trust form to conduct his businesses so that he would earn the income without incurring any liability. However, petitioner was unable to articulate any liability issues that could potentially arise in the course of his businesses, which undermines petitioner's claim that asset protection was a consideration in forming the trusts. On the other hand, petitioner testified that he did not expect that the McKenzie Trust's automobile restoration business would be profitable. We find petitioner's testimony to be completely self-serving, often contradictory, and lacking in credibility.

Petitioners further contend that petitioner formed the Pago Trust to obtain foreign financing while maintaining an interest in the property. However, the record is devoid of any credible evidence that the Brookes Group ever transferred any funds to the Pago Trust. To the contrary, the Pago Trust borrowed funds from a variety of domestic sources in order to purchase and develop the Cross Street property. Petitioner was not aware of the Brookes Group's having ever fulfilled its commitment to provide funds to the Pago Trust and could not explain why the Pago Trust continued to wire funds overseas to the Brookes Group.

Petitioners have not offered any persuasive arguments in support of their contention that the trusts are not shams.

After considering the four factors set forth in <u>Markosian v. Commissioner</u>, 73 T.C. at 1243-1244, it is clear that the Pago and McKenzie Trusts were shams which lacked economic substance and must be disregarded for Federal income tax purposes. Accordingly, we sustain respondent's determination, and we hold that the net income earned by the Pago and McKenzie Trusts is properly taxable to the Gouveias.[28]

## V. Section 6662(a) Penalties

Section 6662(a) and (b)(1) authorizes a 20-percent penalty to be imposed on the portion of an underpayment of income tax attributable to negligence or disregard of rules or regulations. Respondent bears the burden of production, but petitioners have the burden of proof.  Sec. 7491(c).  Negligence "includes any failure to make a reasonable attempt to comply with the provisions of * * * [the Internal Revenue Code]".  Sec. 6662(c); see also <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985) (negligence is the lack of due care or failure to do what a reasonable person would do under the circumstances).

---

[28]In light of our holding, we need not address respondent's alternative arguments that the income from the Pago and McKenzie Trusts is allocable to the Gouveias under the assignment of income doctrine or the grantor trust rules.

We have previously held that a taxpayer's adoption of a "flagrant tax avoidance scheme" repeatedly rejected by the courts is patently negligent. Wesenberg v. Commissioner, 69 T.C. 1005, 1015 (1978); see also Hanson v. Commissioner, T.C. Memo. 1981-675. Respondent has produced ample evidence to demonstrate that the trusts were created for the purpose of tax avoidance and that they lacked economic substance. In addition, when the Gouveias created the trusts, we had already considered several cases involving abusive business trusts and determined that the trusts would not be respected for Federal income tax purposes. See Zmuda v. Commissioner, 79 T.C. 714 (1982); Markosian v. Commissioner, 73 T.C. 1235 (1980); Schneider v. Commissioner, T.C. Memo. 1987-560; Hanson v. Commissioner, supra.

The Gouveias argue that the penalty should not be imposed because they had reasonable cause for the underpayment, and they acted in good faith by relying on advice from accountants and tax return preparers. Section 6664(c)(1) provides that the section 6662 accuracy-related penalty shall not be imposed with respect to any portion of any underpayment if it is shown that a taxpayer acted in good faith and that there was reasonable cause for the underpayment. In determining whether a taxpayer acted in good faith, we consider the taxpayer's knowledge and experience, the taxpayer's reliance, if any, on the advice of well-informed and

competent tax professionals, and the taxpayer's efforts to assess his proper tax liability. Sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioner testified that before forming the trusts, he spoke with his former tax return preparer, who was not familiar with trusts, met with a company called the Independent Trust Consultants, and "read as much material as [he] could from libraries." Petitioner also testified that he hired his tax return preparer because she was "familiar with estates and trusts [and] Form 1041", but he did not ascertain her level of education. The Gouveias introduced no other evidence of their knowledge or degree of experience in tax matters. Moreover, petitioner's testimony does not establish that anyone with whom the Gouveias consulted provided any advice upon which they relied or that the Gouveias made any sincere effort to determine whether the trust arrangement would be respected for Federal income tax purposes. Because the Gouveias have not demonstrated that they acted in good faith and that there was reasonable cause for the underpayment, we sustain respondent's determination that the Gouveias are liable for the accuracy-related penalty under section 6662(a) for 1995, 1996, 1997, and 1998 on any underpayment of income tax attributable to unreported income from the Pago and McKenzie Trusts.

VI. <u>Conclusion</u>

We have carefully considered all remaining arguments made by the parties for results contrary to those expressed herein, and, to the extent not discussed above, we find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decisions will be entered for respondent in docket Nos. 288-03 and 562-03, and appropriate orders will be entered in docket Nos. 563-03 and 564-03.</u>